**Donald E. CLARK, Plaintiff–Appellee,**

v.

**MERRILL LYNCH, PIERCE, FENNER & SMITH, INCORPORATED, a New Jersey corporation; Wendell C. Hoover, Defendants–Appellants.**

No. 90–2039.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 31, 1990.

Decided Jan. 31, 1991.

As Amended Feb. 26, 1991.

Richard H. Sinkfield, argued, Rogers & Hardin, Atlanta, Ga. (Paul W. Stivers, James W. Beverage, Rogers & Hardin, Atlanta, Ga., on the brief), for defendants-appellants.

E. Glenn Robinson, argued, Robinson & McElwee, Charleston, W.Va. (David K. Higgins, Robinson & McElwee, Charleston, W.Va., on the brief), for plaintiff-appellee.

Before MURNAGHAN and NIEMEYER, Circuit Judges, and YOUNG, Senior United States District Judge for the District of Maryland, sitting by designation.

MURNAGHAN, Circuit Judge:

Appellee Donald Clark is a successful businessman who, since 1981, had traded in securities markets through appellant Merrill Lynch, Pierce, Fenner & Smith and its employee-broker, appellant Wendell Hoover. In January of 1985, Clark decided he needed a new investment strategy to meet cash flow requirements and told Hoover that he was thinking of investing in municipal bonds. Hoover and Merrill Lynch options specialist Richard Gordon convinced Clark instead to produce income through a combination of premiums from covered options, dividends, interest, and gains from sales of stock, assuring Clark that such a strategy would meet Clark's monthly cash flow requirements.

The strategy did not perform as expected. By December of 1985, despite repeated assurances by Hoover and Gordon that his monthly income requirements were being met, Clark liquidated his positions and invested in municipal and corporate bonds.

Clark then brought suit in the United States District Court for the Southern District of West Virginia, Charleston Division, alleging state and federal securities fraud claims. The district court (Staker, J.) referred all of the claims to arbitration except the claim brought under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, thereunder. Merrill Lynch filed a motion to compel arbitration of that claim, and the motion was denied.

After a trial on the Section 10(b) claim, the jury returned a verdict in favor of Clark, awarding $1,683,170 in lost income, the increased cost of purchasing the bond portfolio, and prejudgment interest. Merrill Lynch and Hoover appeal, claiming that (1) the district court erred in refusing to compel arbitration of Clark's Section 10(b) claim; (2) Clark failed to prove actionable fraud or fraud in connection with the pur-chase or sale of a security under Section 10(b); (3) Clark failed to prove damages; (4) the damages awarded constituted a double recovery and were speculative; (5) the district court submitted erroneous jury instructions on scienter, damages, reliance, and defenses to fraud; and (6) the district court abused its discretion in denying Merrill Lynch's and Hoover's motion for a new trial. The paramount question confronting us is whether the motion to compel arbitration of the Section 10(b) claim was improperly denied.

I.

Donald Clark lived in Buckhannon, West Virginia, from 1963 until 1983; he started his own company there in 1963. The company provided services to the oil and gas industry, and Clark sold it to NL Industries, Inc. ("NL") in April 1979. Clark received over $9 million on the sale, including 300,000 shares of NL stock valued at $20 per share.

In 1981, Clark opened a brokerage account with Smith Barney, Harris, Upham & Company. Hoover was his broker there, and when Hoover moved to Merrill Lynch shortly thereafter, Clark transferred his account. The account became known as the "02" account.

Hoover also introduced Clark to Richard Gordon, manager of Merrill Lynch's Managed Options Service in New York. Gordon specialized in options, specifically covered call writing. Clark opened a second account with Merrill Lynch in New York in February 1982 which Gordon managed and which became known as the "01" account.

The covered call writing continued through 1981, 1982, and 1983. During that time and into 1984, Clark's income fell by roughly $500,000, and he became pressed for income to pay his expenses. After examining his accounts' performance and concluding that the 02 account was not providing him with a sufficient return, Clark told Hoover in September 1984 to stop trading in options.

On January 16, 1985, Clark, Hoover, and Clark's accountant, Don Nestor, met in Buckhannon. Clark was considering investing in tax-free municipal bonds to produce the income that he felt he needed and told Hoover so. Hoover told Clark that he should consider another course, and recommended income production through a combination of premiums from covered options, dividends, interest, and gains from sales of stock. Hoover emphasized that he believed such a program could exceed the return on municipal bonds. After discussions with Hoover, and after a subsequent telephone conference call with Hoover and Gordon in which Gordon said that he believed that Clark's needs could be met through the recommended strategy, Clark decided not to invest in municipal bonds and to follow Hoover's recommendation to restructure the portfolio.

Clark kept the 01 account in New York with Gordon and the 02 account in Huntington with Hoover and opened a new "03" account in Huntington with proceeds from the sale of his NL stock. Clark's income goals or objectives were $5,500 per month from the 01 account, $15,000 per month from the 02 account, and $25,000 per month from the 03 account, representing an annual return of approximately 12.7%.

As early as February or March 1985, the accounts were failing to meet their objectives. In April or May 1985, Clark spoke with Hoover several times about Clark's inability to conclude from his account statements that his investment objectives were being met. According to Hoover, Clark's objectives were being met and he so informed Clark although that fact was not reflected in the monthly account statements. To address Clark's concerns, Hoover recommended transferring the 02 and 03 accounts from Huntington to New York. The accounts were transferred in June 1985. Hoover continued to be in contact with Clark about his accounts, although investment decisions thereafter were made through Gordon in New York.

Clark, Nestor, Hoover and Gordon met on August 15, 1985, to review the accounts.

At the meeting, Hoover again assured Clark that his accounts were performing as they should. By late October, however, Clark was again pointing out to Hoover and Gordon that he was unable to see where his accounts had earned more in income than he could see in his monthly statements, and arranged a meeting in New York with Gordon and with Nestor, accountant for Clark. Clark and Gordon compared summaries of the accounts at the October 31, 1985, meeting, and Clark, not satisfied with the amounts he had been receiving, stopped any new trading in the accounts. On November 21, 1985, he directed Gordon to close the accounts and liquidate the investments. By December 3, 1985, the liquidation was complete.

Clark brought the present action in August 1986, alleging that Merrill Lynch and Hoover had violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 thereunder. He also alleged that Merrill Lynch and Hoover had violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962 & 1964, and were liable under a number of state law claims. The district court referred all of the state law claims to arbitration [1] but did not act to refer with respect to the Section 10(b) and RICO claims.

Merrill Lynch and Hoover moved to compel arbitration of the federal claims; the motion was granted as to the RICO claim and denied as to the Section 10(b) claim. After trial, the jury returned a verdict in favor of Clark, awarding $1,683,170 in lost income, the increased cost of purchasing the bond portfolio, and prejudgment interest. Merrill Lynch and Hoover filed a timely notice of appeal.

## II.

At the threshold we are confronted with two issues arising from a dispute between the parties as to whether they contractually agreed to submit any claim, including a Section 10(b) claim, to arbitration.

By memorandum opinion and order dated February 9, 1988, the district court ruled

---

1. The arbitration proceedings have been sus-    pended pending the outcome of this appeal.

that Clark's federal securities law claim could be litigated and denied Merrill Lynch's motion to compel arbitration and to stay further court proceedings relating to that claim. A subsequent motion by Merrill Lynch for reconsideration was denied on May 27, 1988. Merrill Lynch now appeals the denial of the motion for reconsideration.

### A. Effect of Waiving Interlocutory Appeal on Availability of Appeal from Final Judgment

■ While conceding that the denial of Merrill Lynch's motion was subject to interlocutory appeal under 28 U.S.C. § 1292(a)(1), Clark contends that this court now lacks jurisdiction to review the district court's ruling on the issue, simply because the time within which to bring the interlocutory appeal has long since expired and that, in failing to bring an interlocutory appeal, Merrill Lynch somehow waived its right to raise the issue on appeal after final judgment. To rule otherwise, continues Clark, would afford Merrill Lynch "a second bite at the apple." In support of his novel argument, Clark cites *Browder v. Director, Dept. of Corrections*, 434 U.S. 257, 98 S.Ct. 556, 54 L.Ed.2d 521 (1978); *Washington v. Bumgarner*, 882 F.2d 899 (4th Cir.1989); and *Shah v. Hutto*, 722 F.2d 1167 (4th Cir.1983) (*en banc*).

The argument is utterly without merit. *Shah* and the other cases Clark cites have nothing to do with the instant case; they involve tardy appeals from final orders and final judgments. Rather, 16 Wright, Miller, Cooper & Gressman, *Federal Practice and Procedure* § 3921 (1977) at 11, provides the proper authority:

[A]lthough appeals are available under § 1292(a)(1) as a matter of right, failure to take an available appeal does not of itself waive the right to secure review, on appeal from final judgment, of matters that could have been appealed but were not.

*See, e.g., Drayer v. Krasner*, 572 F.2d 348, 353 (2d Cir.), *cert. denied*, 436 U.S. 948, 98 S.Ct. 2855, 56 L.Ed.2d 791 (1978) ("failure to take an authorized appeal from an interlocutory order [staying the action pending arbitration] does not preclude raising the question on appeal from the final judgment"). Hence, we clearly have jurisdiction to consider an appeal from the final judgment of the district court's denial of Merrill Lynch's motion to compel arbitration.

### B. Agreement to Litigate Federal Securities Law Claims

■ Turning to the question of an agreement to litigate federal securities claims, Merrill Lynch asserts that the language of the arbitration clauses in all of the brokerage agreements entered into with Clark require arbitration of all of Clark's claims. Thus, it continues, the district court erred in concluding that the contradictory language of one particular agreement was controlling and thus gave Clark the option of litigating his Section 10(b) claim.

Between 1981 and 1985, Clark signed numerous brokerage agreements containing three types of arbitration clauses. The first of those three clauses appears in all of the agreements executed prior to 1985—eight agreements in all—and provides that "any controversy" between Clark and Merrill Lynch arising out of Clark's transactions with Merrill Lynch or out of the particular agreement itself shall be settled by arbitration.

The second arbitration clause, which appears in three other agreements signed in the first half of 1985, provides:

Except to the extent that controversies involving claims arising under the Federal securities laws may be litigated ... any controversy between us ... shall be settled by arbitration.

The third type of arbitration clause, and the one to which the district court ultimately looked in finding a contractual agreement to litigate federal securities claims, appeared in a single Managed Options Agreement signed by the parties on June 24, 1985, and read as follows:

Although you have signed a customer agreement form with MERRILL LYNCH that states that you are required to arbitrate any future dispute or controversy

that may arise between us, you are not required to arbitrate any dispute or controversy that arises under the federal securities laws but instead can resolve any such dispute or controversy through litigation in the courts.

At the same time the Managed Options Agreement was executed, the parties executed two Standard Options Agreements containing the second type of arbitration clause discussed above.[2] The two Standard Options Agreements also contained a clause which purported to resolve conflicting language in other brokerage agreements. The clause reads:

Any agreement by me with you, whether previously or hereafter made applicable to any account of mine with you, shall also apply to such option transactions except to the extent which it conflicts with this agreement. In the event of a conflict, this agreement shall control, and where there is no conflict, each provision of each agreement shall apply.

Merrill Lynch offers two arguments as to why the district court erred in concluding that the language of the Managed Options Agreement clause clearly and unambiguously shows that the parties intended and agreed that Clark did not have to submit to arbitration—but rather could litigate—any claim arising out of alleged violations of federal securities laws.

First, Merrill Lynch contends that, because of the conflict resolution clauses in the Standard Options Agreements signed the same day as the Managed Options Agreement, the arbitration clauses in the Standard Options Agreements—the second type of clause discussed above—control and must be read in connection with the arbitration clause in the Managed Options Agreement. Thus, the argument continues, because the district court concluded that the language of the second type of clause requires arbitration of all claims, it erred in finding otherwise under the Managed Options Agreement clause.

Second, Merrill Lynch urges that the language of the arbitration clause contained in the Managed Options Agreement is simply a notice provision mandated by a now-rescinded SEC rule, Rule 15c2–2, 17 C.F.R. § 240.15c2–2 (1987),[3] and that as such does not create any substantive right to litigate rather than arbitrate a federal securities law claim. Therefore, claims Merrill Lynch, the inclusion of the Rule's language by Merrill Lynch in any agreement with Clark should not be held to have superseded and rendered void previous agreements to arbitrate all disputes.

■ As a preliminary proposition, we note that, in construing the arbitration clauses of contracts, there exists a presumption in favor of arbitrability. *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *see also Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (as with any other contract, parties' intentions control, but those intentions are generously construed as to issues of arbitrability). The question, so reframed, is whether the language of the

---

**2.** Thus constituting two of the three agreements signed in the first half of 1985 which contained the second type of clause at issue.

**3.** Rule 15c2–2, entitled "Disclosure regarding recourse to the courts notwithstanding arbitration clauses in broker-dealer customer agreements," provided, in pertinent part:

(a) It shall be a fraudulent, manipulative or deceptive act or practice for a broker or dealer to enter into an agreement with any public customer which purports to bind the customer to the arbitration of future disputes between them arising under the Federal securities laws, or to have in effect such an agreement, pursuant to which it effects transactions with or for a customer.

(b) Notwithstanding paragraph (a) of this section, until December 31, 1984 a broker or dealer may use existing supplies of customer agreement forms if all such agreements entered into with public customers after December 28, 1983 are accompanied by the separate written disclosure:

Although you have signed a customer agreement form with FIRM NAME that states that you are required to arbitrate any future dispute or controversy that may arise between us, you are not required to arbitrate any dispute or controversy that arises under the Federal securities laws but instead can resolve any such dispute or controversy through litigation in the courts.

agreements between Clark and Merrill Lynch is sufficient to overcome the presumption of arbitrability in favor of litigating the Section 10(b) claim.

We quickly dispose of Merrill Lynch's first contention by noting that the language of the arbitration clauses in the Standard Options Agreements was also added in response to the notice provisions mandated by SEC Rule 15c2–2, an observation with which both the district court and Merrill Lynch agree. *See Clark v. Merrill Lynch, Pierce, Fenner & Smith*, CA–86–879–3 (S.D.W.Va. Feb. 9, 1988) (order granting in part and denying in part the defendant's motion to compel arbitration and stay proceedings) at 6; Brief of Appellants at 24, n. 9. Thus, the arbitration clauses in the Standard Options Agreements and the Managed Options Agreement, all executed together on June 24, 1985, are not in conflict at all, rendering immaterial the question of which arbitration clause controls.

As noted earlier, however, the district court interpreted the language of the arbitration clauses in the Managed Options Agreement (the result of voluntary action) and the Standard Options Agreement (included only because of Securities and Exchange Commission mandate) differently. The court found that the language of the arbitration clauses in the Standard Options Agreements "to be advice or notice to the customer that the courts have held that claims involving the securities laws are not subject to binding arbitration agreements (not an expression by Merrill Lynch of willingness to litigate)," an obvious reference to Rule 15c2–2. But in construing the arbitration clause contained in the Managed Options Agreement, the court found that, because Rule 15c2–2 required the specific notice provision contained in the Rule be included in brokerage agreements only until December 31, 1984, the language of the clause in the Managed Options Agreement, entered into by Clark and Merrill Lynch on June 24, 1985 (*i.e.*, well after December 31, 1984), had to be construed to have become, chameleon-like, a voluntary agreement not to require arbitration. In so construing the clause language, the court concluded that

the parties had agreed to litigate the Section 10(b) claim and denied Merrill Lynch's motion to compel arbitration. The only remaining question, then, is which of the district court's interpretations of two similar clauses contained in three documents executed on the same day—June 24, 1985—is correct.

To answer that question, we need look no further than Judge Murray's well-reasoned opinion in *Tauber v. Prudential–Bache Securities, Inc.* [Current Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,226, 1990 WL 78530 (D.Md.1990). In *Tauber*, the district court was confronted with facts virtually indistinguishable from the instant case in ruling on the defendant broker's motion to compel arbitration. There the plaintiff had entered into a series of brokerage agreements from 1984 through 1986. The agreements entered into in 1984, like all of the agreements for Clark's 01 account and most of the agreements for his 02 account, contained arbitration clauses whereby the parties agreed to submit *all* claims to arbitration. The agreements entered into in 1985 and 1986 contained arbitration clauses containing language very similar to that contained in Clark's Standard Options Agreements signed on June 24, 1985. The *Tauber* court also noted that it had been the defendant's practice during 1984 to provide clients with the same notice contained in Clark's Managed Options Agreement.

Like Clark, the plaintiff in *Tauber* argued that the litigation language in the 1985 and 1986 agreements should be construed not as mere notice but as creating a substantive right to litigate federal securities law claims. The *Tauber* court began its analysis by carefully examining (a) the Supreme Court case law shaping Rule 15c2–2 from cradle to grave; *see Wilko v. Swan*, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953); *Shearson/American Express Inc. v. McMahon*, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987); *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989); (b) other circuits' construction of the Rule's language as a substantive term of the contract or as mere

notice; *see, e.g., Ballay v. Legg Mason Wood Walker, Inc.*, 878 F.2d 729 (3d Cir. 1989); *Gooding v. Shearson Lehman Bros. Inc.*, 878 F.2d 281 (9th Cir.1989); and (c) various courts' attempts to draw distinctions between substantive and notice provisions by examining the precise language involved; *see, e.g., Stander v. Financial Clearing & Services Corp.*, 718 F.Supp. 1204 (S.D.N.Y.1989). The court then turned to a line of cases from this circuit which have consistently held that the Rule does not create any substantive rights nor does "a party's preference for litigation over arbitration '... rise to the level of a substantive right.' " *Jeske v. Brooks*, 875 F.2d 71, 75 (4th Cir.1989); *see also Ottenritter v. Shearson Lehman Hutton, Inc.*, 727 F.Supp. 980 (D.Md.1989); *Fisher v. Prudential–Bache Securities Inc.*, 635 F.Supp. 234 (D.Md.1986); *Shotto v. Laub*, 632 F.Supp. 516 (D.Md.1986). We are disinclined to depart from that line of reasoning now.

Admittedly, Judge Murray's opinion in *Tauber* did not address the fact, present in *Tauber*, that the precise language set forth in Rule 15c2–2(b), *see* n. 3, *supra*, was only required to appear in brokerage agreements until December 31, 1984. But we think that here the district court below construed subsection (b) too broadly in concluding that Rule 15c2–2 must not have required any type of notice after that date and so must be deemed to have served a contractual purpose thereafter. Subsection (b) merely provided a grace period within which brokers were permitted to use preexisting brokerage forms. The obvious implication of such a provision is that after December 31, 1984, brokers should print new forms conforming to the requirements of the Rule if they meant to stay up to date, not that notice language was no longer required, and so the language had to become contractual in nature.

Had the parties entered into brokerage agreements containing the Rule's notice provisions after the Rule had been rescinded in 1987, *see* Sec. Exch. Act Rel. No. 25034, [1987 Transfer Binder], Fed.Sec.L. Rep. (CCH) ¶ 84,163, 52 Fed.Reg. 39, 271 (Oct. 15, 1987), the district court's reasoning would have far more force. Here, however, the agreements were entered into while the Rule was still in effect, rendering *Jeske, Ottenritter*, and *Fisher* fully applicable. Obviously, the *Tauber* court reached the same conclusion.

We thus hold that the litigation language contained in the arbitration clauses of the Standard Options Agreements and the Managed Options Agreement entered into by Clark and Merrill Lynch on June 24, 1985, were notice provisions only and did not create a substantive right to litigate federal securities law claims. Like the court in *Tauber*, we find additional support for that conclusion by noting the parties' prior course of conduct in agreeing, in at least eight brokerage agreements entered into between 1981 and 1985, to submit all claims to arbitration, including federal securities law claims.[4] There is nothing in the record to indicate that Clark at any time bargained for an agreement to the contrary.[5]

The district court erred, therefore, in construing the arbitration clause of the Managed Options Agreement as an agreement between the parties to litigate federal securities law claims and in denying Merrill Lynch's motion to compel arbitration of Clark's Section 10(b) claim. Accordingly, we vacate the judgment of the district court and remand the case to the district court with instructions to compel arbitration of the Section 10(b) claim.

VACATED AND REMANDED.

---

**4.** Of course, those agreements entered into while Rule 15c2–2 was in effect were nonetheless enforceable. *Fisher*, 635 F.Supp. at 236.

**5.** Indeed, Clark testified at trial that he did not read his brokerage agreements with Merrill Lynch.