Opinion by Judge McKEOWN; Dissent by Judge MILAN D. SMITH, JR.
OPINION
McKEOWN, Circuit Judge:
This appeal reads like a telenovela, a Spanish soap opera. It pits music celebrities, who make money by promoting themselves, against a gossip magazine, that makes money by publishing celebrity photographs, with a paparazzo, who apparently stole the disputed pictures, stuck in the middle. Noelia Lorenzo Monge and Jorge Reynoso (“the couple”), Latin American celebrities, claim that Maya Magazines, Inc. and Maya Publishing Group, LLC (collectively “Maya” or “the magazine”) infringed their copyrights by publishing previously unpublished photos of their clandestine wedding in “TVNotas,” a Spanish-language celebrity gossip magazine. The district court granted Maya summary judgment on the ground that publication of the images was fair use under the Copyright Act of 1976. We disagree and reverse. The tantalizing and even newsworthy interest in the photos does not trump a balancing of the fair use factors. Simply put, Maya did not sustain its burden of establishing that its wholesale, commercial use of the previously unpublished photos constituted fair use.
Factual and Procedural Background
I. The Cast
Noelia Lorenzo Monge is a pop singer and model. Jorge Reynoso is her manager and husband, and a music producer. Oscar Viqueira is a paparazzo who occasionally worked as a driver and bodyguard for the couple during their visits to Miami. Maya publishes multiple magazines, including the celebrity gossip magazine “TVNotas.” In the past, Maya has paid Monge to pose for pictures published in its magazine, “H Para Hombres.” Reynoso was paid $25,000 for photos of his wedding to his former wife Pilar Montenegro, as well as $40,000 for photos of his vacation in Paris with Montenegro.
II. The Set
Monge and Reynoso were married at the “Little White Wedding Chapel” in Las Vegas, Nevada on January 3, 2007. Valuing their privacy, and Monge’s image as a *1169 young, single pop singer, the couple went to great lengths to keep the wedding a secret: only the minister and two chapel employees witnessed the ceremony. Using Monge’s camera, chapel employees took three photos of the wedding; later that night at least three more photos of Monge and Reynoso in their nuptial garb were also taken. The pictures were intended for the couple’s private use. For two years Monge and Reynoso succeeded in keeping their wedding a secret, even from their families.
In the summer of 2008, Reynoso used Viqueira’s sport utility vehicle. Viqueira claims that after Reynoso returned the car, Viqueira found a memory chip in the ashtray. When Viqueira looked at the files on the memory chip, he found the photos of the couple’s secret wedding, along with an assortment of other photos and videos. Viqueira tried to capitalize on the files to extort money he claimed Reynoso owed him. When this plan failed, in February 2009, Viqueira sold to Maya all of the electronic files he had taken “to recuperate the payment for [his] work.” The price was $1,500. The couple testified, and Maya does not contest, that Viqueira did not have permission to take or sell any of the images on the memory chip.
III. The Drama
Reynoso received a phone call from his mother in February 2009, berating him for getting married without telling her. Intent on secrecy, Reynoso denied the marriage to his own mother, but to no avail: She had already seen the wedding photos in a gossip magazine. Maya had published six of the stolen photos — three of the wedding ceremony and three of the wedding night — in Issue 633 of TVNotas. Prior to Issue 633, the photos were unpublished. The headline on the front cover of the magazine stated: “The Secret Wedding of Noelia and Jorge Reynoso in Las Vegas.”[1] The byline stated: ‘We even have photos of their first night as a married couple!” This text was positioned beside the wedding photo on the cover. Three photos were reproduced on the cover: one showing Monge lying on a bed revealing her underwear; one of Reynoso smoking a cigar in front of a neon Playboy logo; and one depicting the newly-married couple.
Inside the magazine, the photos were featured over a two-page spread. “Apparently, the couple married in Las Vegas in January 2007!” was written on the top of the spread. “First and exclusive photos of the secret wedding of Noelia and Jorge Reynoso” was also printed in large font on the spread.
The left side of the spread was comprised of one large wedding photo, a reprint from the cover. Printed on top of this photo was: “Only in TVNotas”; and the caption read: “In fact, a lot has been said about a supposedly secret wedding in Las Vegas, Nevada, that took place in January 2007, but until now, no one had shown photos of that memorable day. TVNotas got a hold of those photos and shows them to you now, exclusively.”
The right side of the spread was comprised of four photos. The photos showed the couple next to a priest, kissing in wedding attire, and at a bar. The picture of Monge on a bed with her underwear showing, also published on the cover, was repeated. The footer of this page stated: “Although the couple has declined to confirm their marriage, these photos that we got speak for themselves.”
*1170 These six images were the only ones Maya published from the assortment of approximately four hundred images and three videos obtained from Viqueira. Maya did not publish other supporting evidence such as a marriage certificate, choosing instead to rely solely on the sensational photos. The couple claims that the three wedding photos published comprise every wedding photo taken, and that the three photos of the wedding night comprise almost every photo of the wedding night. Maya does not challenge either contention. Nor is there any dispute that Maya generated revenue from sales of Issue 683. Maya also admits that, in the past, it has paid for exclusive rights to publish pictures of celebrity weddings, including other celebrity weddings depicted in Issue 633.
IV. The Court Proceedings
Soon after publication of the pictures, the couple registered copyrights in five of the six published photos — all the published pictures, except the one where the couple appears together in front of a Playboy logo.[2] Monge and Reynoso then filed a complaint against Maya asserting claims for copyright infringement, statutory misappropriation of likeness, and common law misappropriation of likeness.
The district court dismissed the misappropriation of likeness claims and struck the couple’s claims for statutory damages under the Copyright Act. The parties filed cross-motions for summary judgment. The district court granted Maya’s motion for summary judgment based on fair use under 17 U.S.C. § 107, and also granted Maya’s motion for attorney’s fees and costs.
Analysis
The sole issue on appeal is whether the district court properly granted summary judgment in favor of Maya predicated on the fair use doctrine. We review de novo the district court’s finding of fair use, a mixed question of law and fact. Kelly v. Arriba Soft Corp., 336 F.3d 811, 817 (9th Cir.2003).
I. The Fair Use Doctrine
The fair use doctrine has been called “the most troublesome in the whole law of copyright.” Dellar v. Samuel Goldwyn, Inc., 104 F.2d 661, 662 (2d Cir. 1939) (per curiam). This affirmative defense presumes that unauthorized copying has occurred, and is instead aimed at whether the defendant’s use was fair. As with all affirmative defenses, Maya as the defendant bears the burden of proof. See Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 561, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). Despite its claim that it purchased the photos in good faith, “the innocent intent of the defendant constitutes no defense to liability.” 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.08[B][1] (Matthew Bender rev. ed.2011) (footnote omitted).
Fair use is a central component of American copyright law. Although its roots, like copyright law itself, may be traced to English courts,[3] the doctrine first took hold in this country in Justice Story’s opinion in Folsom v. Marsh, 9 F.Cas. 342 *1171 (No. 4901) (C.C.D.Mass.1841). He wrote that “a fair and bona fide abridgement of an original work[ ] is not a piracy of the copyright of the author.” Id. at 345. Foreshadowing future commentary on fair use, Justice Story noted that “what constitutes a fair and bona fide abridgement, in the sense of the law, is one of the most difficult points, under particular circumstances, which can well arise for judicial discussion.” Id. Justice Story characterized copyright cases as approaching “the metaphysics of the law, where the distinctions are, or at least may be, very subtle and refined, and, sometimes, almost evanescent.” Id. at 344.
Fair use became more concrete when it was codified in the Copyright Act of 1976: “[T]he fair use of a copyrighted work ... for purposes such as criticism, comment, news reporting, teaching ..., scholarship, or research, is not an infringement of copyright.” 17 U.S.C. § 107. Courts are directed to determine fair use on the basis of the following non-exclusive factors:
(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
(2) the nature of the copyrighted work;
(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
(4) the effect of the use upon the potential market for or value of the copyrighted work.
Id. In 1992, Congress amended the fair use section to address the status of unpublished works: “The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.” Id.
In the years following the 1976 Act, courts have decided countless cases involving the fair use doctrine. Some commentators have criticized the factors, labeling them “billowing white goo”[4] or “naught but a fairy tale,”[5] echoing courts that threw up their hands because the doctrine is “so flexible as virtually to defy definition.” Princeton Univ. Press v. Mich. Doc. Servs., Inc., 99 F.3d 1381, 1392 (6th Cir.1996) (citation omitted). A leading treatise in this area notes that the statute provides “no guidance as to the relative weight to be ascribed to each of the listed factors,” and, in the end, “courts are left with almost complete discretion in determining whether any given factor is present in any particular use.” Nimmer on Copyright § 13.05[A] (footnotes omitted).
We acknowledge the porous nature of the factors but nonetheless recognize that we are obliged to make sense of the doctrine and its predicates. Over time, there has been a shift in analytical emphasis in the fair use factors, in large part due to several key Supreme Court cases. The relative importance of factor one — “the purpose and character” of the use — and factor four — “the effect of the use upon the potential market” — has dominated the case law. Because these factors are also significant here, we take the time to discuss the recent evolution of the doctrine. Two key Supreme Court cases guide our analysis: Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985), and Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994).
Harper & Row is particularly instructive because it involved the unpublished memoirs of a public figure, President Ford. Just before Time Magazine was scheduled *1172 to publish excerpts from President Ford’s forthcoming book, The Nation magazine published an article that included, from an unauthorized source, verbatim quotations from the book. The Court held that “use of the[] verbatim excerpts from the unpublished manuscript was not a fair use.” 471 U.S. at 569,105 S.Ct. 2218.
In discussing the fair use factors, the Court illuminated several points that bear on this case. Commenting on the public interest issue, the Court faulted the court of appeals for “concluding that The Nation’s use of the copyrighted material was excused by the public’s interest in the subject matter.” Id. In that vein the Court admonished:
It is fundamentally at odds with the scheme of copyright to accord lesser rights in those works that are of greatest importance to the public.... [W]e see no warrant for expanding the doctrine of fair use to create what amounts to a public figure exception to copyright.
Id. at 559-60, 105 S.Ct. 2218. Similar to our case, the confidentiality of the unpublished works was central in Harper & Row. Brushing aside The Nation’s effort to sidestep liability, the Court wrote that “[a] use that so clearly infringes the copyright holder’s interests in confidentiality and creative control is difficult to characterize as ‘fair.’ ” Id. at 564, 105 S.Ct. 2218.
Echoing its then-recent decision in Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984), superseded on other grounds by statute, 17 U.S.C. § 1201, the Court synthesized the fourth factor, the effect on the potential market as “undoubtedly the single most important element of fair use.” Harper & Row, 471 U.S. at 566, 105 S.Ct. 2218. In its conclusion, the Court cautioned as follows: “Congress has not designed, and we see no warrant for judicially imposing, a ‘compulsory license’ permitting unfettered access to the unpublished copyrighted expression of public figures.” Id. at 569, 105 S.Ct. 2218. In other words, the Court did not give a fair use free pass to news reporting on public figures, nor did it embrace the notion that the unpublished nature of the work is without consequence.
Almost ten years later, the Court returned to the fair use doctrine in Campbell, 510 U.S. 569, 114 S.Ct. 1164. The case arose in the context of a parody by 2 Live Crew of the Roy Orbison and William Dees song “Oh, Pretty Woman.” The Court addressed the first factor and highlighted “that the commercial or nonprofit educational purpose of a work is only one element of the first factor enquiry....” Id. at 584, 114 S.Ct. 1164. It debunked the notion that Sony called for a “hard evidentiary presumption” that commercial use is presumptively unfair. Id. Instead, the Court harkened back to its explanation in Harper & Row that commercial use “tends to weigh against a finding of fair use,” and said “[b]ut that is all.” Id. at 585, 114 S.Ct. 1164 (internal quotation marks omitted).
The Court also clarified the role of the fourth factor, market harm, and criticized reliance on Sony to support a presumption of market harm in the event of transformative commercial use. It noted that “Sony’s discussion of a presumption contrasts a context of verbatim copying of the original in its entirety for commercial purposes, with the noncommercial context of Sony itself (home copying of television programming).” Id. at 591, 114 S.Ct. 1164. Of course, commercial use may tip the scale toward market harm, but like the other factors, it “may be addressed only through a ‘sensitive balancing of interests.’ ” Id. at 590 n. 21, 114 S.Ct. 1164 (citation omitted).
Against this backdrop, we address the four fair use factors.
*1173 II. Fair Use Factors
A. Purpose and Character of the Use
The first factor includes three principles that simultaneously complement and yet are in tension with one another in this case: news reporting; transformation; and commercial use.
1. News Reporting
The preamble to the fair use statute lists “news reporting” as an illustrative basis supporting fair use under this factor. 17 U.S.C. § 107. We have little doubt that the gossip magazine’s sensational coverage of the wedding qualifies as news reporting. Our role in this regard is not as a literary critic. Campbell, 510 U.S. at 582, 114 5.Ct. 1164 (whether “in good taste or bad does not and should not matter to fair use”). While the parties agree that the pictures at issue are newsworthy, we must nevertheless proceed cautiously because “[t]he promise of copyright would be an empty one if it could be avoided merely by dubbing the infringement a fair use ‘news report’ of the [work].” Harper & Row, 471 U.S. at 557, 105 S.Ct. 2218.
Although news reporting is an example of fair use, it is not sufficient itself to sustain a per se finding of fair use. The “fact that an article arguably is ‘news’ and therefore a productive use is simply one factor in a fair use analysis.” Id. at 561, 105 S.Ct. 2218. In other words, fair use has bounds even in news reporting, and no per se “public interest” exception exists. See, e.g., Murphy v. Millennium Radio Grp. LLC, 650 F.3d 295, 307 (3d Cir.2011) (“[N]ews reporting does not enjoy a blanket exemption from copyright. News organizations are not free to use any and all copyrighted works without the permission of the creator simply because they wish to report on the same events a work depicts.”); Nuñez v. Caribbean Int’l News Corp., 235 F.3d 18, 22 (1st Cir.2000) (allowing publication of three pictures for news purposes, but clarifying that “[t]his is not to say that ... use of the photographs was necessarily fair merely because the photographs were: used for news purposes, nor does it establish a general ‘newsworthiness’ exception.”). Because Maya cannot simply take fair use refuge under the umbrella of news reporting, we analyze Maya’s coverage in light of two other considerations: the degree of transformation occasioned by Maya’s use; and the commercial nature of its use.[6]
2. Transformation
Transformation is a judicially-created consideration that does not appear in the text of the statute. According to Campbell:
The central purpose of this investigation is to see, in Justice Story’s words, whether the new work merely “super-cede[s] the objects” of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in *1174 other words, whether and to what extent the new work is “transformative.”
510 U.S. at 579, 114 S.Ct. 1164 (citations and quotation marks omitted). “[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use.” Id.
Transformation in the news reporting context has been litigated repeatedly in our circuit, often involving the Los Angeles News Service. In L.A. News Serv. v. Reuters Television Int’l, we stated that despite the newsworthiness of the videos at issue, which documented a beating during a riot in Los Angeles, their mere rebroadcast was not in itself transformative: “Although [Reuters’s] service does have a news reporting purpose, its use of the works was not very transformative. Reuters copies footage and transmits it to news reporting organizations; Reuters does not explain the footage, edit the content of the footage, or include editorial comment.” 149 F.3d 987, 993 (9th Cir.1998). Similarly, a news station’s broadcast of an extraordinarily timely news segment concerning ongoing riots related to the Rodney King beating was held unfair: Even though the news station “apparently ran its own voice-over, it does not appear to have added anything new or transformative to what made the [ ] work valuable—a clear, visual recording of the beating itself.” L.A News Serv. v. KCAL-TV Channel 9, 108 F.3d 1119, 1122 (9th Cir.1997). Minor changes, such as placing “voice-overs” on video clips, do not “necessarily transform a work.” Elvis Presley Enters., Inc. v. Passport Video, 349 F.3d 622, 628-29 (9th Cir.2003), overruled on other grounds as stated, in Flexible Lifeline Sys., Inc. v. Precision Lift, Inc., 654 F.3d 989, 995 (9th Cir.2011) (per curiam).
Arrangement of a work in a photo montage, however, can be transformative where copyrighted material is incorporated into other material. For example, the use of a brief segment of a riot clip in a promotional video was deemed to be fair use.' L.A. News Serv. v. CBS Broad., Inc., 305 F.3d 924 (9th Cir.2002), as amended, 313 F.3d 1093. Nonetheless, “[m]erely plucking the most visually arresting excerpt from [ ] nine minutes of footage cannot be said” to be transformative, but
inclusion of the clip in the video montage that introduced the Prime Time Justice program, following editing for dramatic effect, has a better claim to be within the scope of “transformation.” The development of the montage at least plausibly incorporates the element of creativity beyond mere republication, and it serves some purpose beyond newsworthiness.
Id. at 939; see also Murphy, 650 F.3d at 306 (disallowing copying of unaltered image because there was “no meaningful distinction between the purpose and character” of the creator’s use and the infringer’s use of reporting news).
The pictures here are a “clear, visual recording” of the couple’s wedding and wedding night. KCAL-TV Channel 9, 108 F.3d at 1122. Because publication of photographic evidence that constitutes proof of a newsworthy event is not automatically fair use, we turn to the degree to which Maya’s use transformed the works. Each of the individual images was reproduced essentially in its entirety; neither minor cropping nor the inclusion of headlines or captions transformed the copyrighted works. The reasoning regarding voice-overs from Elvis Presley Enterprises applies with equal vigor to headlines and captions over still images. 349 F.3d at 628-29.
The individual images were marginally transformed, however, in other ways. The text and article accompanying the photos, as well as their arrangement in a photo montage, may give the pictures “a *1175 further purpose.” CBS Broad., Inc., 805 F.3d at 938 (citation and quotation marks omitted). Campbell makes clear that the “heart” of a claim for transformative use is “the use of some elements of a prior author’s composition to create a new one that, at least in part, comments on that author’s works.” 510 U.S. at 580, 114 S.Ct. 1164. Of course, in Campbell, the question related to parody, a direct comment aimed at the original song. The dissent’s vivid description of the copyrighted photos does not undermine the conclusion that there was no real transformation of the photos themselves. Nor can it be said, as in Campbell, that Maya created a new work based on the photos.
Even if the photos were not physically or creatively transformed, Maya claims that publication of the photos as an exposé amounted to transformation. In other words, Maya’s publication transformed the photos from their original purpose — images of a wedding night — into newsworthy evidence of a clandestine marriage.[7] In support, Maya relies heavily on Núñez, a First Circuit case that is distinguishable. 235 F.3d 18. In Núñez, a photographer sued a newspaper that published his copyrighted images of a woman that had won the title of “Miss Universe Puerto Rico.” Id. at 21. In at least one photo, the woman appeared naked or nearly naked. After a local television station displayed the risqué photographs, the model was interviewed about “her fitness to retain the Miss Universe Puerto Rico crown.” Id. Soon after, a local newspaper published the photographs without permission, along with several articles about the controversy. Id.
Although Núñez also involved news reporting, the similarities end there. The controversy there was whether the salacious photos themselves were befitting a “Miss Universe Puerto Rico,” and whether she should retain her title. In contrast, the controversy here has little to do with photos; instead, the photos here depict the couple’s clandestine wedding. The photos were not even necessary to prove that controverted fact — the marriage certificate, which is a matter of public record, may have sufficed to inform the public that the couple kept their marriage a secret for two years. Indeed, “[t]he public interest in the free flow of information is assured by the law’s refusal to recognize a valid copyright in facts.” Iowa State Univ. Research Found., Inc. v. Am. Broad. Cos. Inc., 621 F.2d 57, 61 (2d Cir.1980). Under copyright law, Maya possesses “an unfettered right to use any factual information revealed [through the photos] for the purpose of enlightening its audience, but it can claim no need to bodily appropriate [the couple’s] expression of that information by utilizing portions of the actual [photos].” Id. (internal quotation marks omitted). Unlike here, in Núñez “the pictures were the story,” and the newspaper in Núñez did not seek to “manufacture newsworthiness,” nor did it “scoop” the story. 235 F.3d at 22.[8] Also significant, *1176 the work in Núñez had already been distributed when the infringement occurred. Id. at 20.
We reiterate what the First Circuit emphasized, namely that there is no “general ‘newsworthiness’ exception.” Id. In other words, newsworthiness itself does not lead to transformation. The dissent’s doomsday prediction about the impact of our decision on investigative journalism is overblown. See Harper & Row, 471 U.S. at 561, 105 S.Ct. 2218 (“The issue is not what constitutes news, but whether a claim of newsreporting is a valid fair use defense to an infringement of copyrightable expression. The [magazine] has every right to seek to be the first to publish information. But [the magazine] went beyond simply reporting uncopyrightable information and actively sought to exploit the headline value of its infringement, making a news event out of its unauthorized first publication of a noted figure’s copyrighted expression.” (internal quotation marks and citation omitted)).
Maya’s purpose in publishing the photos was to expose the couple’s secret wedding, which was at odds with the couple’s purpose of documenting their private nuptials. See Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146, 1165 (9th Cir.2007) (using “images in a new context to serve a different purpose” may be transformative). But even an infringer’s separate purpose, by itself, does not necessarily create new aesthetics or a new work that “alter[s] the first [work] with new expression, meaning or message.” Infinity Broad. Corp. v. Kirkwood, 150 F.3d 104, 108 (2d Cir.1998) (quoting Campbell, 510 U.S. at 579, 114 S.Ct. 1164). A “difference in purpose is not quite the same thing as transformation, and Campbell instructs that transformativeness is the critical inquiry under this factor.” Id.
Maya did not transform the photos into a new work, as in Campbell, or incorporate the photos as part of a broader work, as in CBS Broadcasting. Instead, unlike the thumbnail images at issue in Perfect 10, Maya left the inherent character of the images unchanged. See Perfect 10, Inc., 508 F.3d at 1165 (“a search engine provides social benefit by incorporating an original work into a new work, namely, an electronic reference tool.”). Maya’s use— wholesale copying sprinkled with written commentary—was at best minimally trans-formative. See Pierre N. Leval, Toward a Fair Use Standard, 103 Harv. L. Rev. 1105, 1111 (1990) (use of copyrighted material that “merely repackages or republishes the original” is unlikely to be fair use).
3. Commercial Use
Maya’s use was undisputedly commercial in nature. The gossip magazine makes no pretense that it is educational. It is a commercial publication.
The Supreme Court has stated that “every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright.” Sony, 464 U.S. at 451, 104 S.Ct. 774. Commercial use is a “factor that tends to weigh against a finding of fair use” because “the user stands to profit from exploitation of the copyrighted material without paying the customary price.” Harper & Row, 471 U.S. at 562, 105 S.Ct. 2218. There is no dispute here that Maya is motivated by profits, and in fact profited from the publication of the pictures.
*1177 Although Maya’s reporting on the clandestine wedding was newsworthy, newsworthiness, by itself, is insufficient to demonstrate fair use. Similarly, exposing truths in the public interest is not a bell weather of fair use. See Chicago Bd. of Educ. v. Substance, Inc., 354 F.3d 624, 629-30 (7th Cir.2003) (denying fair use defense for a newspaper that published in their entirety six “secure” tests—tests that are generally kept secret—to demonstrate their shortcomings). Maya’s minimal transformation of the photos is substantially undercut by its undisputed commercial use. See Infinity Broadcast Corp., 150 F.3d at 109 (the different, and possibly beneficial, purposes of the copying is outweighed by the total absence of transformativeness). On balance, the first factor is at best neutral, and does not support Maya’s claim of fair use.
B. Nature of the Copyrighted Work
Under the second factor, we address two aspects of the work: the extent to which it is creative and whether it is unpublished. Harper & Row, 471 U.S. at 563-64, 105 S.Ct. 2218.
Photos are generally viewed as creative, aesthetic expressions of a scene or image and have long been the subject of copyright. See 17 U.S.C. § 102(a)(5) (extending copyright protection to “pictorial, graphic, and sculptural works”). In the seminal case protecting photos, the Supreme Court held that a photographic portrait of Oscar Wilde was entitled to copyright protection because of various creative elements employed by the photographer. Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 61, 4 S.Ct. 279, 28 L.Ed. 349 (1884). Although the Court expressly declined to rule on whether “the ordinary production of a photograph” necessarily exhibits sufficient originality to claim copyright, id. at 59, 4 S.Ct. 279, our court has recognized that individual photos merit copyright protection. See, e.g., Ets-Hokin v. Skyy Spirits, Inc., 225 F.3d 1068, 1074 (9th Cir.2000) (“Indeed, the idea that photography is art deserving [copyright] protection reflects a longstanding view of Anglo-American law.”).
Admittedly, the point-and-shoot images here are hardly the work of famous photographers like Richard Avedon, Diane Arbus, or Annie Liebovitz. But neither are they entirely factual in nature, as Maya argues. Simply because a photo documents an event does not turn a pictorial representation into a factual recitation of the nature referenced in Harper & Row. Photos that we now regard as iconic often document an event—whether the flight of the Wright Brothers’ airplane, the sailor’s kiss in Times Square on V-J Day, the first landing on the moon, or the fall of the Berlin Wall. See generally Photos that Changed the World (Prestel Verlag 2000).
Although the published photos were not highly artistic in nature, they do have a defining and common characteristic—until Issue 633 hit the stands, they were unpublished. We pointedly note that we address the unpublished status of the photos only under copyright principles, not privacy law. See Bond v. Blum, 317 F.3d 385, 395 (4th Cir.2003) (“the protection of privacy is not a function of the copyright law.”). “It may seem paradoxical to allow copyright to be obtained in secret documents, but it is not.... [F]ederal copyright is now available for unpublished works that the author intends to never see the light of day.” Chicago Bd. of Educ., 354 F.3d at 627. We begin with a basic principle: “the unpublished nature of a work is a key, though not necessarily determinative, factor tending to negate a defense of fair use.” Harper & Row, 471 U.S. at 554, 105 S.Ct. 2218 (quotation and other marks omitted). The Court specifically honed in on the unpublished status of *1178 the work, calling it “a critical element of its ‘nature.’” Id. at 564, 105 S.Ct. 2218. Accordingly, “[ujnder ordinary circumstances, the author’s right to control the first public appearance of his undisseminated expression will outweigh a claim of fair use.” Id. at 555, 105 S.Ct. 2218 (emphases added).
The Court has been silent on what sort of “extraordinary circumstances” overcome the presumption against prepublication fair use; however, under a 1992 amendment to the Copyright Act, “[t]he fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all [four] factors.” 17 U.S.C. § 107. The 1992 addition to the fair use statute undid a line of Second Circuit cases that created a bar on fair use where unpublished letters were being used in biographies. See New Era Publ’ns Int’l v. Henry Holt & Co., 878 F.2d 576, 583 (2d Cir.1989); Salinger v. Random House, Inc., 811 F.2d 90, 99-100 (2d Cir.1987). The congressional report noted that it was “not the Committee’s intention to alter the weight currently given by the courts to the unpublished nature of a work under the second fair use factor. The general principles regarding fair use of unpublished works set forth by the Supreme Court in Harper & Row v. Nation Enterprises still apply.” H.R.Rep. No. 102-286, at 9 (1992), reprinted in 1992 U.S.C.C.A.N. 2553, 2561. The Senate confirmed the vitality of Harper & Row: “we intend to roll back the virtual per se rule of Salinger and New Era, but we do not mean to depart from Harper & Row.” S.Rep. No. 102-141, at 5-6 (1991).
We are unable to discern anything extraordinary about the situation here, and agree with the district court that Maya’s “publication undoubtedly supplanted Plaintiffs’ right to control the first public appearance of the photographs.” Contra Núñez, 235 F.3d at 23 (“[Defendant] did not aim to use the photographs to compete with Núñez, nor to supplement his right of first production”). This finding further distinguishes Núñez, where the works were hardly confidential or secret and “had already been distributed” when the infringement occurred. Id. at 21, 23. In contrast, Maya’s headlines bragged about its exclusive photo spread of never before seen images.
In analyzing the second factor, the nature of the work, we balance the copyright protection received by marginally creative works with the Supreme Court’s clear recognition that the unpublished status of the work is a “critical element.” These aspects counter-balance each other, and because the case is not exceptional, we apply the Supreme Court’s admonition that with respect to unpublished works, this factor “outweighs” Maya’s claim of fair use. See Harper & Row, 471 U.S. at 555, 105 S.Ct. 2218.
C. Amount and Substantiality op the Portion Used
The third statutory factor in the fair use analysis is “the amount and substantiality of the portion used in relation to the copyrighted work as a whole.” 17 U.S.C. § 107(3). We examine both the quantitative and qualitative aspects of the portion of the copyrighted material taken. Campbell, 510 U.S. at 586, 114 S.Ct. 1164. Quantitatively, every single photo of the wedding and almost every photo of the wedding night were published. With respect to the ceremony, none of the three published photos were heavily cropped. The same is true regarding the remaining photos, with the exception of the image where Reynoso is smoking a cigar. Qualitatively, the minimal cropping of each picture demonstrates that the “heart” of each individual copyrighted picture was published. Elvis Presley Enters., 349 F.3d at 630 *1179 (courts should “look to see whether ‘the heart’ of the copyrighted work is taken.”).
The inquiry under this factor is a flexible one, rather than a simple determination of the percentage of the copyrighted work used. But we should be clear, Maya copied 100 percent of the copyrighted photos at issue. Id. (noting as to Elvis Presley photos, defendants used “entire picture” in the infringing work). While we do not discredit Maya’s legitimate role as a news gatherer, its reporting purpose could have been served through publication of the couple’s marriage certificate or other sources rather than copyrighted photos. Even absent official documentation, one clear portrait depicting the newly married couple in wedding garb with the priest would certainly have sufficed to verify the clandestine wedding. Maya used far more than was necessary to corroborate its story — all three wedding images and three post-wedding photos. Thus, analyzing both the quantitative and qualitative aspects of the published material, this factor weighs against fair use.
Maya does not challenge the copyright-ability of the individual photos, and each of the five individual images is part of a separate and distinct copyright registration. During oral argument, however, the district court minimized the amount and substantiality of Maya’s use in stating: “Defendants published only 5 [sic] of the 400 photographs of plaintiffs’ wedding that defendants purchased.”[9] While Maya did obtain over four hundred images and three videos from Viqueira’s stolen memory chip, only six of the pictures were related to the night of the wedding. Maya, which is in possession of the images, did not produce any of the other images or offer any details as to the remaining content in this assortment. The district court’s statement — that “400 photographs of plaintiffs’ wedding” were purchased — was in error.
This error was not inconsequential. Benchmarking the use of six images against a vast collection that the court perceived to be other wedding photos tainted the district court’s lens on the situation. The facts are to the contrary — a limited number of private photos were taken on Monge’s camera on the wedding day and Maya published six of those images. To suggest that this usage should be compared to a universe of four hundred other unidentified images and videos that happened to be located on the storage device makes little sense. It would be akin to taking a random collection of copyrighted materials from someone’s trash can and using the stack as the universe of copyrighted work, using a memory stick to copy random photos from various computer files, or randomly downloading hundreds of unrelated copyrighted images from the Internet and thereafter claiming that the infringing use was insubstantial simply because only a few images from this “compilation” were published. Maya’s acquisition of a random collection of unidentified, non-wedding related images and videos does not bear on the fair use analysis here, the district court’s analysis notwithstanding.
The dissent does not explain why the only work at issue is the purported “compilation” or “collection” bought by Maya. More disconcerting is that the dissent’s characterization of the four hundred photos as a “compilation” misapprehends the meaning of this term in the copyright law. *1180 A “compilation” is defined as “a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. The term ‘compilation’ includes collective works.” 17 U.S.C. § 101 (emphasis added); see also id. (defining a “collective work” as a work “in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole.” (emphasis added)).
The dissent’s effort to recast the images on the storage disk as a “compilation” poses several insurmountable hurdles for Maya. To its credit, Maya made no such argument; this theory is an invention by the dissent. To begin, there is absolutely no evidence that the multiple images were in any way “selected, coordinated, or arranged” to create “an original work of authorship.” Maya did not even submit for the record the other material on the storage disk and nothing in the record supports a finding regarding compilation. Indeed, it would take an act of legal clairvoyance to deem the material on the disk a copyrighted compilation without ever seeing it. Finally, Maya bears the burden on this point and yet has offered nothing. To say, as the dissent does, that Maya “carefully selected the photos” (Dissent at 1191) glosses over the reality that Maya copied all of the wedding-related photos. Total appropriation, not selection, would be a more accurate characterization.
Each of the individual wedding photos is a separate work[10] because each photo “can live [its] own copyright life” and “has an independent economic value and is, in itself, viable.” Columbia Pictures TV, Inc. v. Krypton Broad of Birmingham, Inc., 259 F.3d 1186, 1193 (9th Cir.2001) (affirming prior decision that each episode of television series was a separate “work”) (citations omitted). In sum, there is no compilation and it makes sense to treat each photo as an individual copyrighted work. Even if the facts could be stretched and the grouping of wedding photos could qualify as a compilation, the result would be the same — Maya’s use was not just substantial, it was total. This factor weighs decisively against fair use.
D. Effect upon the Potential Market
The final fair use factor is “the effect of the use upon the potential market for or value of the copyrighted work.” 17 U.S.C. § 107(4) (emphasis added). The Supreme Court declared in Harper & Row that “[t]his last factor is undoubtedly the single most important element of fair use.” 471 U.S. at 566, 105 S.Ct. 2218 (footnote and citation omitted). Maya argued, and the district court agreed, that no potential market for the pictures existed because the couple did not intend to sell publication rights to the photos. The district court’s legal conclusion that the potential market was destroyed due to the couple’s then-present intent regarding publication was in error.
As discussed above, in Campbell, the Court offered a nuanced approach relating to the presumption of market harm. It explained that commercial use may tip the scale toward market harm, but like the other factors, it “may be addressed only *1181 through a ‘sensitive balancing of interests.’ ” Campbell, 510 U.S. at 590 n. 21, 114 S.Ct. 1164 (quotation omitted). Specifically, where “the second use is transformative, market substitution is at least less certain, and market harm may not be so readily inferred.” Id. at 591, 114 S.Ct. 1164. However, a presumption of market harm “makes common sense[] when a commercial use amounts to mere duplication of the entirety of an original.” Id. Thus, the market harm analysis is affected by whether the harm is caused by commercial use of a mere duplicate or by commercial use post-transformation. Cf. Leadsinger, Inc. v. BMG Music Publ’g, 512 F.3d 522, 531 (9th Cir.2008) (“when ‘the intended use is for commercial gain,’ the likelihood of market harm ‘may be presumed’ ” (quoting Sony, 464 U.S. at 451,104 S.Ct. 774)).
In light of the Supreme Court’s admonition eschewing presumptions under this factor, we refrain from presuming harm in the potential market; instead, we determine it in the first instance. The cases addressing the potential market for unpublished works illustrate the importance of letting the copyright owner control first publication. “Under section 107, ‘potential market’ means either an immediate or a delayed market, and includes harm to derivative works.” Cable/Home Commc’n Corp. v. Network Prods., Inc., 902 F.2d 829, 845 (11th Cir.1990). Control over the delayed market includes future markets. Id. Our circuit has gone further to state that “[e]ven an author who had disavowed any intention to publish his work during his lifetime was entitled to protection of his copyright, first, because the relevant consideration was the ‘potential market’ and, second, because he has the right to change his mind.” Worldwide Church of God v. Philadelphia Church of God, Inc., 227 F.3d 1110, 1119 (9th Cir.2000). The Second Circuit is in accord: “It would ... not serve the ends of the Copyright Act— i.e., to advance the arts — if artists were denied their monopoly over derivative versions of their creative works merely because they made the artistic decision not to saturate those markets with variations of their original.” Castle Rock Entm’t, Inc. v. Carol Publ’g Grp., 150 F.3d 132, 145-46 (2d Cir.1998) (internal quotation marks omitted). The potential market for the photos exists independent of the couple’s present intent, and the district court’s decision to the contrary was error.
Recognizing that fair use focuses on potential, not just actual, market harm, we note there is little doubt that an actual market exists for the photos. See Harper & Row, 471 U.S. at 567, 105 S.Ct. 2218 (“The trial court found not merely a potential but an actual effect on the market.”). Maya does not offer any evidence of the relevant market or the lack of market harm from its publication other than broad, unsubstantiated statements in its brief. Campbell, 510 U.S. at 590, 114 S.Ct. 1164 (“Since fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets.” (footnotes omitted)). The magazine’s failure of proof is hardly surprising: The couple is undisputedly in the business of selling images of themselves and they have done so in the past and Maya itself paid $1,500 for prior photos. Maya’s purchase of the pictures unequivocally demonstrates a market for the couple’s copyrighted pictures. And Maya is itself a participant in the market for celebrity wedding photos, as Issue 633 also featured pictures of another celebrity wedding with photos that the magazine purchased. The demand for the pictures in the actual market, just as in the potential *1182 market, dropped significantly upon Maya’s first and exclusive publication.
The impact on the potential market for unpublished works is best illustrated by the Court’s analysis in Harper & Row: “The right of first publication implicates a threshold decision by the author whether and in what form to release his work.” 471 U.S. at 553, 105 S.Ct. 2218 (emphasis added). In other words, “[p]ublication of an author’s expression before he has authorized its dissemination seriously infringes the author’s right to decide when and whether it will be made public, a factor not present in fair use of published works.” Id. at 551, 105 S.Ct. 2218; id. at 564, 105 S.Ct. 2218 (“right of first publication encompasses ... the choice whether to publish at all”). As in Worldwide Church of God, Monge and Reynoso have “the right to change [their] mind.” 227 F.3d at 1119. They reasonably could decide to sell the images for profit in the future, as Reynoso has demonstrably done in the past. Similarly, photos of Monge have also been marketed commercially, even to a Maya publication. While Maya boldly emphasized that its publication was “[f]irst and exclusive,” the couple’s intention at the time of the publication did not give Maya license to forever deprive them of their right to decide when, “whether and in what form to release” the photos. Harper & Row, 471 U.S. at 551, 553, 105 S.Ct. 2218. Thus, Maya’s claim that a confidential work receives less copyright protection because its author intends to maintain confidentiality finds no support; to the contrary, “[i]t has never been seriously disputed that the fact that the plaintiffs work is unpublished ... is a factor tending to negate the defense of fair use.” Id. at 551, 105 S.Ct. 2218 (internal quotation marks omitted).
Although the photos were unpublished until Maya printed them for commercial gain, after the publication of Issue 633, the bottom literally dropped out of the market — neither Maya nor anybody else is likely to purchase these pictures from the couple. And it is obvious that any licensing value, to the extent the couple could find a willing licensee, is severely diminished. Maya’s un-authorized “first and exclusive” publication of the images substantially harmed the potential market because the publication directly competed with, and completely usurped, the couple’s potential market for first publication of the photos.
In addition, “to negate fair use one need only show that if the challenged use should become widespread, it would adversely affect the potential market for the copyrighted work.” Id. at 568, 105 S.Ct. 2218 (quotations omitted). Unrestricted and widespread reproduction of Maya’s conduct would not only undermine the ability of celebrities to market images of themselves, but would also create incentives to pirate intellectual property. In this case, “[t]here is no analytical difference between destroying the market for a copyrighted work by producing and selling cheap copies and destroying the subsequent years’ market for a [work] by blowing its cover.” Chicago Bd. of Educ., 354 F.3d at 627.
Our focus on the usurpation of the market further underscores the limited extent to which Maya transformed the works. In a true transformation, such as the parody in Campbell, “it is more likely that the new work will not affect the market for the original ... because the parody and the original usually serve different market functions.” 510 U.S. at 591, 114 S.Ct. 1164. Not so here. Maya did not transform the images and create a new work; instead, Maya’s mere duplication of the photos “serves as a market replacement for [the originals], making it likely that *1183 cognizable market harm to the original[s] will occur.” Id. (citations omitted).[11]
The curtailment of both the actual and potential market for the pictures demonstrates that Maya’s use, even if credited as mildly transformative, nonetheless functioned as a market replacement for the photos. In this respect, while we do not presume market harm, such a presumption would, as the Supreme Court recognized, make “common sense” here because Maya’s commercial use was based on duplication of the original. Id. (discussing Sony, 464 U.S. at 451, 104 S.Ct. 774).
This factor brings us full circle. We recognize that market harm may not be presumed in all instances; however, the harm to both the potential and actual markets based on wholesale copying of unpublished works demonstrates the logic of such a presumption in cases “when a commercial use amounts to mere duplication of the entirety of an original.” Id. Because the facts demonstrate that Maya’s use was akin to mere duplication — affecting both the actual and potential market for the photos — even without the benefit of any presumption, this factor tips against fair use. In this case, the cat is out of the bag.
III. Denouement
Our long journey through the nooks and crannies of fair use law with our colorful cast of characters comes to an end as we determine whether the “most troublesome” doctrine in the law of copyright protects Maya’s use. This is neither a mechanistic exercise nor a gestalt undertaking, but a considered legal judgment. Following the statute, we consider each of the four factors and put them in the judicial blender to find the appropriate balance. In doing so, we are not without guidance. Precedent from both the Supreme Court and our court gives us a solid foundation to make this judgment. Although we delineate the factors individually, we recognize that our task is to consider these non-exclusive factors as a total package in assessing fair use.
Waving the news reporting flag is not a get out of jail free card in the copyright arena. Iowa State Univ. Research Found., 621 F.2d at 61 (“The fair use doctrine is not a license for corporate theft, empowering a court to ignore a copyright whenever it determines the underlying work contains material of possible public importance.”). Maya’s effort to document its exposé does not automatically trump the couple’s rights in its unpublished photos. Because the minimal transformation occasioned by Maya’s use is amply outweighed by its commercial use, the first factor does not support the magazine. And, even if it did, this factor does not dwarf the effect of the other factors. Upon balancing the copyright protection for these marginally creative works against their unpublished status, we see nothing exceptional about this case, and follow the Supreme Court’s direction that the second factor weighs against Maya in this instance. Next, Maya has not demonstrated that the third factor supports fair use. Maya used virtually the entirety of the wedding-related photographs; much more than was necessary to corroborate its story. Finally, the district court further erred by holding, without support, that the couple’s then-present intention destroyed the potential market for the photographic works. Maya’s use negatively affected both the potential and actual markets for the couple’s photos. Simply because the works were yet unpublished did not give Maya a license to *1184 pull the trigger and blow the couple’s cover.
The balancing of these factors must be weighed against Maya’s burden to establish fair use. Without a single factor tipping in its favor, Maya has not met its burden. Because Maya’s affirmative defense of fair use fails as a matter of law, the district court erred by granting summary judgment in favor of Maya on the basis of fair use.[12] Instead, the district court should have granted the couple’s summary judgment motion on this issue.
REVERSED and REMANDED.

. The record contains English translations of the statements made in the Spanish-language magazine.

. Because only fair use is at issue, we assume the legitimacy of the couple's copyright in each of the five photos for which they provided copyright registrations. See 17 U.S.C. § 410(c) (registration serves as prima facie evidence of validity); id. § 411(a) (federal registration is required before bringing an infringement action). We express no opinion as to the ownership of copyright regarding the sixth photo nor do we express an opinion as to the ultimate copyright status of any of the photos. See United Fabrics Int’l, Inc. v. C & J Wear, Inc., 630 F.3d 1255 (9th Cir.2011).

. Matthew Sag, The Prehistory of Fair Use, 76 Brook. L. Rev. 1371, 1372-73 (2011).

. Jessica Litman, Billowing White Goo, 31 Colum. J.L. & Arts 587, 596 (2008).

. David Nimmer, "Fairest of Them All” & Other Fairy Tales of Fair Use, 66 Law & Con-temp. Probs. 263, 287 (2003).

. In evaluating the "purpose and character” factor, we apply "the general rule that a party claiming fair use must act in a manner generally compatible with principles of good faith and fair dealing.” Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146, 1164 n. 8 (9th Cir.2007) (citing Harper & Row, 471 U.S. at 562-63, 105 S.Ct. 2218). The couple claims that the magazine acted in bad faith by failing to: seek permission from them; confirm that the copyrights in the images belonged to Viqueira; and seek any documentation as to ownership. Maya presents evidence, however, that it procured a written copyright assignment from Viqueira, and argues that it had no reason to believe that the known paparazzo did not have rights to the photos. While the couple's arguments may call into question Maya’s good faith, Maya’s actions do “not amount to an abuse of the good faith and fair dealing underpinnings of the fair use doctrine.” Id. Application of the defense is not foreclosed.

. While the couple undisputedly kept the wedding a secret, contrary to the dissent's assertion, the record contains no evidence that the couple made affirmative representations about their marital status. There is no evidence that the couple repeatedly denied their marriage or made other public statements to the contrary. The district court erred in making such factual findings and likewise erred in inferring such representations during the summary judgment proceeding. *1176 ment.”). In any event, neither example the dissent provides pertains to a "private,” unpublished work'—both Tiger Woods and Congressman Weiner distributed their "masterpieces” to others.

. Contrary to the dissent's concern, where the content of the work is the story, such as a controversy over a congressman’s "salacious” photos or a golf celebrity’s "sext” messages, news reporters would have a better claim of transformation, which, far from being determinative, is simply one of the factors we consider in the fair use analysis. See Murphy, 650 F.3d at 307-08 ("Under many circumstances, reporters will indeed be able to claim a fair use defense against claims of infringe-

. The district court made a clearly erroneous finding of fact with respect to this factor. See Sawyer v. Whitley, 505 U.S. 333, 372, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992) (a district court’s findings of fact are reviewed for clear error). Although Maya undisputedly published six photos, the district court's finding that five photos, instead of six, were published is an inconsequential error that does not affect our analysis.

. Although the Copyright Act does not define the term "work,” courts approach the definition depending on the specific issue, for example, deciding proper registration, determining whether a work is sufficiently original, and calculating statutory damages. See generally Nimmer on Copyright § 2.08. We need not parse the definition in the context of fair use because the outcome does not depend on it. No evidence supports treating the four hundred photos as a single work.

. For a discussion of the interplay between transformation of the work and the effect upon the potential market, see Nimmer on Copyright § 13.05[4], which explains the tautology inherent in this factor.

. Because the district court erred in granting summary judgment in favor of Maya, we do not reach the issue of awarding Maya its attorney's fees.