**THRESHOLD MEDIA CORP. dba Spin Move Records, Plaintiff,**

v.

**RELATIVITY MEDIA, LLC, et al., Defendants.**

**Case No. CV 10–09318 DMG (AJWx)**

United States District Court, C.D. California.

Signed March 15, 2013

Douglas L. Johnson, Nausheen Kazalbasch, Neville Lawrence Johnson, Johnson and Johnson LLP, Beverly Hills, CA, for Plaintiff.

Jeff Sanders, Ritholz Levy Sanders Chidekel & Fields LLP, New York, NY, David H. Boren, Ritholz Levy Sanders Chidekel and Fields LLP, Los Angeles, CA, for Defendant.

## ORDER RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT

DOLLY M. GEE, UNITED STATES DISTRICT JUDGE

This matter is before the Court on Defendants' motion for summary judgment and partial summary judgment. The Court held a hearing on January 13, 2012. Having duly considered the respective positions of the parties, as presented in their briefs and at oral argument, the Court now renders its decision. For the reasons set forth below, Defendants' motion is GRANTED.

## I.

### PROCEDURAL HISTORY

On December 3, 2010, Plaintiff Threshold Media Corp. filed the operative complaint against Defendants Relativity Media, LLC, Relativity Rogue, LLC, Universal City Studios Productions, LLLP, Supermarche, Inc., Henry Joost, Ariel Schulman, Hit the Ground Running Enterprises, LLC, Andrew Jarecki, and Marc Smerling [Doc. # 1]. In the complaint, Plaintiff raises a single claim for copyright infringement based on five allegedly unauthorized uses of its song "All Downhill from Here" in Defen-

dants' film *Catfish*.[1] (*Id.* ¶ 18.) On November 15, 2011, Defendants filed their motion for summary judgment and partial summary judgment [Doc. # 48].

## II.

### COMPLIANCE WITH LOCAL RULE 7–3

As a preliminary matter, Plaintiff asks the Court to strike Defendants' motion for summary judgment because Defendants failed to comply with Local Rule 7–3. Plaintiff further requests that the Court impose sanctions against Defendants under Local Rule 83–7.

■ Although a district court's local rules have "the force of law," *Hollingsworth v. Perry*, 558 U.S. 183, 130 S.Ct. 705, 710, 175 L.Ed.2d 657 (2010) (*per curiam*) (quoting *Weil v. Neary*, 278 U.S. 160, 169, 49 S.Ct. 144, 73 L.Ed. 243 (1929)), "Local Rules are promulgated by District Courts primarily to promote the efficiency of the Court, and ... the Court has a large measure of discretion in interpreting and applying them." *Lance, Inc. v. Dewco Servs., Inc.*, 422 F.2d 778, 784 (9th Cir. 1970).

Decisions from the Central District of California reflect a flexible approach to the application of Local Rule 7–3. *See, e.g., Internet Direct Response, Inc. v. Buckley*, No. SACV 09–1335 ABC (MLG), 2011 WL 835607, at *1 n.1, 2011 U.S. Dist. LEXIS 28344, at *2–3 n.1 (C.D.Cal. Mar. 7, 2011) ("Plaintiff failed to satisfy its meet-and-confer obligations.... Rather than once again postponing adjudication of these motions, in this instance the Court will reach the merits, but Plaintiff is admonished to comply with Local Rule 7–3...."); *Partee v. United Recovery Grp.*, No. CV 09–9180

PSG (CWX), 2010 WL 1816705, at *1 n.1, 2010 U.S. Dist. LEXIS 54025, at *2 n.1 (C.D.Cal. May 3, 2010) (overlooking failure to include statement of compliance); *So v. Land Base, LLC*, No. CV 08–03336 DDP (AGRX), 2009 WL 1322462, at *2, 2009 U.S. Dist. LEXIS 43093, at *5 (C.D.Cal. May 8, 2009) ("The Court will not deny the motion for failure to comply with Local Rule 7–3.... Although the Court shares Defendants' frustration with Plaintiff's failure to comply with the Local Rules, the Court is satisfied with Plaintiff's explanation for why that conference was not possible."); *Molnar v. 1–800–Flowers.com, Inc.*, No. CV08–0542 CAS (JCx), 2009 WL 481618, at *1 n.2, 2009 U.S. Dist. LEXIS 131768, at *3–4 n.2 (C.D.Cal. Feb. 23, 2009) (considering substance of plaintiff's arguments despite his alleged violation of Local Rule 7–3).

The purpose of Local Rule 7–3, as the Rule itself makes clear, is for "counsel to discuss thoroughly, *preferably in person*, the substance of the contemplated motion" so that they may "reach a resolution which eliminates the necessity for a hearing." C.D. Cal. L.R. 7–3 (emphasis in original).

Plaintiff was on notice that Defendants planned to file a summary judgment motion based on Defendants' asserted fair use defense. In the parties' March 7, 2011 joint Rule 26(f) report, Defendants stated their intention "to move for summary judgment on the ground that whether their use of the composition and sound recordings at issue constitutes copyright infringement or fair use is a question of law." (Jt. Rule 26(f) Report at 5 [Doc. # 27].) Plaintiff articulated its "position that this action involves clear factual disputes regarding the nature of the film

---

1. The fifth allegation of unauthorized use in the complaint is not at issue in this motion because the commercial version of the film does not feature Plaintiff's work during the

film's closing credits, as did the version screened at Sundance. Unless otherwise specified, references to *Catfish* denote the commercial version of the film.

'Catfish,' and its use of the copyrighted works in question, which cannot be summarily adjudicated." (*Id.*) Thus, the parties clearly discussed the issues raised in the motion for summary judgment several months before Defendants filed it.

Furthermore, in mid-July the parties had several informal discussions regarding Defendants' planned summary judgment motion based on fair use. On July 13 and July 21, 2011, the parties engaged in telephonic meet-and-confer conferences, at each of which Defendants advised Plaintiff that they intended to move for summary judgment on fair use grounds at the close of discovery. (Sanders Reply Decl. ¶¶ 11–12, 15 [Doc. # 69].) At the July 13, 2011 conference, Plaintiff was highly critical of Defendants' fair use defense. (*Id.* ¶ 13.) After a deposition on July 18, 2011, Plaintiff's counsel Neville Johnson and Defendants' counsel Jeff Sanders discussed the anticipated motion—including some of the issues that counsel believed were pertinent to the fair use defense—informally over lunch. (*Id.* ¶ 14.)

■ Thus, Defendants satisfied the requirements of Local Rule 7–3 in substance if not in form. Moreover, it is manifest that further discussions on fair use would not have been fruitful. The fact that Defendants used Plaintiff's intellectual property is not in dispute. Thus, fair use is a legal issue—indeed, the *central* legal issue in this case—on which the parties fundamentally disagree. Either Defendants' inclusion of Plaintiff's intellectual property in their film was fair use—in which case Plaintiff's claims fail—or it was not fair use and Defendants are liable for copyright infringement.[2] Therefore, Plaintiffs' requests to strike the motion for summary judgment and for sanctions are DENIED.

**2.** Fair use is Defendants' only affirmative de-

## III.

## FACTUAL BACKGROUND

As it must on this motion for summary judgment, the Court sets forth the material facts, some of which are disputed, and views all reasonable inferences to be drawn from them in the light most favorable to Plaintiff, the non-moving party.

### A. *Amy Kuney's Two Versions of "All Downhill from Here"*

Plaintiff owns the master sound recording "All Downhill from Here" by Amy Kuney, in which she and Tim Myers perform the song as a duet (the "Studio Recording"). (Opp'n, Ex. 24 [Doc. # 59–4].) Plaintiff also owns the master sound recording of the acoustic version of the song that is available on YouTube (the "Acoustic Recording"). (*Id.*) The Studio Recording is approximately three and a half minutes long (3:29), and the Acoustic Recording is slightly more than three minutes long (3:09). (Opp'n, Ex. 8 [Doc. # 59–2].)

### B. *Defendants' Film Catfish*

Defendants collectively are responsible for directing, producing, financing, marketing, and distributing the film, *Catfish*. (Defs.' Statement of Uncontroverted Facts ("SUF") at 15. [Doc. # 48–2].) Marketed as a "reality thriller" (*see* Joost Decl., Ex. A ("DVD")) and filmed in a documentary style, *Catfish* follows the story of Yaniv Schulman, a 24–year–old photographer who lives in New York City, as he develops an online friendship with Abby, an eight-year-old girl in Ishpeming, Michigan, her mother Angela, and several of their family and friends, including—and especially—Abby's 19–year–old half-sister, Megan. The story is filmed by Yaniv's brother, Ariel, and their friend Henry Joost.

fense. (*See* Defs.' Answers [Doc. ## 13–16].)

### 1. *Catfish*'s Plot

At the start of the film, Yaniv and Abby have been corresponding through the mail and Facebook for several months. They were first introduced when Abby sent Yaniv paintings that she created depicting Yaniv's photography. Abby explains in her initial letter that she created these paintings after encountering Yaniv's photographs in a newspaper article. (DVD at 2:13–4:23.)

Approximately nine minutes into the 87–minute film, its focus shifts to Yaniv's relationship with Megan. Yaniv thinks that Megan "has a big crush" on him. (*Id.* at 9:33–9:34.) Megan writes and records a song for Yaniv, which is played while Yaniv discusses it. (*Id.* at 13:06–13:32.) Soon thereafter, Yaniv and Megan are shown using increasingly flirtatious language in their online correspondence. (*Id.* at 15:18–16:11, 16:52–18:00.) When asked if they're "full on going out," Yaniv responds "We're not, but . . . if we met each other and the attraction exists in real life . . . it would be like—instantaneous relationship." (*Id.* at 16:13–16:28.) Yaniv sends a postcard to Megan in which he writes "I have a really good feeling about 'us.'" (*Id.* at 17:01.)

### 2. The Four Allegedly Infringing Uses

#### a. The First Use

In a pivotal scene—containing the copyrighted material at issue—Yaniv, Ariel, and Henry are in Vail, Colorado to make a dance film. The three of them are in their hotel room. Yaniv—who is instant messaging with Megan—announces that "Me-gan is taking requests, and she'll record a song right now." (*Id.* at 19:05–19:08.) Yaniv asks Megan to record "Tennessee Stud." (*Id.* at 19:17–19:24.) She emails Yaniv an mp3 file containing an acoustic recording of the song, which Yaniv plays while he, Ariel, and Henry discuss how impressed they are with her talent. (*Id.* at 19:25–20:19.)

Yaniv explains to Ariel that on Angela's Facebook page she has posted digital copies of a number of songs purportedly recorded by her and Megan. (*Id.* at 20:20–20:29.) Yaniv clicks on a song entitled "Downhill," and the Acoustic Recording is heard playing from his computer for approximately 19 seconds—from the beginning of the song until partway through the third line of the introductory verse (the "first use").[3] (*Id.* at 20:30–20:48.) While the music is playing in the background, Ariel and Henry tell Yaniv to let Megan know how much they love her songs, and Yaniv is shown typing this into an instant message. (*Id.* at 20:35–20:47.)

#### b. The Second Use

Ariel begins singing along with the music before it cuts out, continuing for a few seconds afterward, for a total of approximately 16 seconds (the "second use"). (*Id.* at 20:47–21:02.)

#### c. The Third Use

Ariel is shown on his laptop entering a Google search of the phrase "'its [sic] all downhill from here' song." (*Id.* at 20:56–21:08.) The film immediately cuts to a shot of an audio player playing a track entitled "All Downhill From Here / BY Amy Kuney [featuring] Tim Myers / ON

---

**3.** The introductory verse of the song before leading into the chorus has the following lyrics: "Can't pull myself out of the bed, / it's 12 o'clock inside my head / the people outside feel so far away. / I have a headache in my chest, / from all the chaos that you left. / Caffeine and aspirin take me away." The chorus lyrics are as follow: "You tipped my world up on its side, / but it's all downhill from here. / Mountaintops, level like parking lots / 'cause it's all downhill from here. / Down down down . . . . ["down" repeated twelve more times]" (Opp'n, Ex. 8, "Studio Version All Downhill from Here.")

One Tree Hill." The Studio Recording is heard playing from Ariel's computer.

Yaniv says, "Huh. Sort of sounds like it. A little different though." (*Id.* at 21:08–21:17.) After approximately eight seconds, Yaniv and Ariel are shown discussing the track:

Yaniv: It's really similar though.

Ariel: It's not as good. Angela's is better.

Yaniv: Yes.

(*Id.* at 21:17–21:36.) At this point, the music ends. The entire clip of the Studio Recording lasts approximately 28 seconds—from the beginning of the song through the end of the introductory verse (the "third use").

Yaniv and Ariel continue their conversation:

Ariel: All right. Listen, you can't hold it against her. She didn't say, "Hey, I wrote this song."

Yaniv: It doesn't matter, it's just still—yeah.

Ariel: Yeah. And still, her voice is ten times better than this girl. And she's clearly an artist because that came from a deep—from deep expression and feeling.

Yaniv: And she found a song, kind of obscure.

Ariel: She covered a song, yeah. People make careers out of that.

Yaniv: Yeah.

(*Id.* at 21:37–21:58.)

#### d. The Fourth Use

The film then cuts to a shot of Ariel's computer playing a track entitled "Amy Kuney 'All Downhill From Here' (Original) from One Tree Hill." The Acoustic Recording is heard playing from the computer.

Yaniv: You're just playing this off Facebook.

Ariel: No, I'm not, I'm playing this off of ... look. [He points to the track listing.[4]] Amy Kuney.

The camera turns to focus on Yaniv and Ariel, who are listening intently to the audio track:

Yaniv: This is it.

Henry: I heard, I mean ... I have food in my mouth.

Yaniv: I mean, is this not the exact same recording?

Ariel: I'm not sure. Sounds a little different.

Henry: This is definitely it.

Yaniv: Definitely it.

(*Id.* at 21:58–22:38.) The music ends at that point. The 41–second clip starts just before the fourth line of the introductory verse and ends after the fourth line of the chorus (the "fourth use").

Yaniv, now realizing that he has been deceived, becomes agitated:

Yaniv: They posted it online.

Ariel: Uh huh.

Yaniv: She posted somebody else's music.

Ariel: Did she post it—

Yaniv: Now that doesn't mean she doesn't just put up a song that she likes—fine. But it's called—the artists—"Mom and Megan," and I complimented her and she said thanks for listening to me cough the dust off my vocal cords.... She responded to a number of compliments that I gave her about the song and how much I liked it and it's not even her singing. It's just a recording of somebody else's.

---

4. Yaniv appears to be using Songza, a "music search engine and Internet jukebox" that was highly popular at the time. Brad Stone, *Free*

*Music Site Has a New Riff,* N.Y. Times, Sept. 8, 2008, at C5.

Ariel: Are we sure about that?

Yaniv: Yes.

(*Id.* at 22:39–23:18.)

Yaniv then replays the track of "Tennessee Stud" that Megan sent him and claimed to have recorded herself. He expresses doubt that it's actually Megan performing and thinks it may be "that other girl," *i.e.,* Amy Kuney. (*Id.* at 23:19–23:55.) Ariel finds and plays a YouTube clip of Suzanna Choffel performing "Tennessee Stud" on Valentine's Day 2008, which Yaniv immediately recognizes is identical to "Megan's" version. (*Id.* at 23:56–24:33.)

Now convinced that Megan and her family "are complete psychopaths" (*id.* at 24:45–24:48), Yaniv tells Ariel and Henry that he wants nothing more to do with them (*id.* at 25:10–25:22). Ariel and Henry convince him to travel to Michigan to confront Megan and Angela and uncover the truth. (*Id.* at 32:30–32:57.)

The remainder of the film chronicles this journey and its fallout. In Michigan, Yaniv learns that Megan does not exist. She and most of Abby's other friends and family were concocted and impersonated by Angela.

### 3. Marketing and Distribution of *Catfish*

Defendants marketed and distributed *Catfish* without Plaintiff's permission to use Amy Kuney's musical works.

## IV.

### LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct.

2505, 91 L.Ed.2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Partial summary judgment may be sought on any claim or defense, or part thereof, and the court may grant less than all of the relief requested by the motion. *See* Fed. R.Civ.P. 56(a), (g).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(c), (e) (1986)); *see also Norse v. City of Santa Cruz,* 629 F.3d 966, 973 (9th Cir.2010) (*en banc*) ("Rule 56 requires the parties to set out facts they will be able to prove at trial."). "[T]he inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Fair use is a mixed question of law and fact. *Monge v. Maya Magazines, Inc.,* 688 F.3d 1164, 1170 (9th Cir.2012) (citing *Kelly v. Arriba Soft Corp.,* 336 F.3d 811, 817 (9th Cir.2003)). Where the facts—viewed in the light most favorable to the plaintiff—are sufficient to evaluate each of the statutory factors, a court may grant summary judgment for the defendant if it determines that the challenged use of the copyrighted work qualifies as a fair use as a matter of law. *See Mattel, Inc. v. Walking Mountain Prods.,* 353

F.3d 792, 800 (9th Cir.2003) (quoting *L.A. News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 942 (9th Cir.2002)).

## V.

## DISCUSSION

The Copyright Clause vests Congress with the power "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8. It recognizes that "creative intellectual activity is vital to the well-being of society," and serves to encourage creative endeavors by "confer[ring] monopoly-exploitation benefits for a limited duration on authors and artists." Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L.Rev. 1105, 1109 (1990); *see also Mazer v. Stein*, 347 U.S. 201, 219, 74 S.Ct. 460, 98 L.Ed. 630 (1954) ("The economic philosophy behind the [Copyright Clause] is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors in 'Science and useful Arts.' "). Under the Copyright Act of 1976, a copyright holder of a musical work enjoys a number of exclusive rights, including the right to reproduce and publicly perform the work. 17 U.S.C. § 106(1), (4).

■ Though exclusive, these rights are subject to a number of limitations—in particular, fair use. *See id.* § 107. The fair use defense offers courts a way "to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1399 (9th Cir.1997) (quoting *Iowa State Univ. Research Found., Inc. v. ABC*, 621 F.2d 57, 60 (2d Cir.1980)). Thus, copyright law strikes a utilitarian balance between two competing yet complementary societal interests: providing sufficient economic incentives to stimulate the creation of new works while protecting a large and vibrant public domain in which new ideas can flourish. *See* Leval, *supra*, at 1109 ("Monopoly protection of intellectual property that impeded referential analysis and the development of new ideas out of old would strangle the creative process.... The doctrine of fair use limits the scope of the copyright monopoly in furtherance of its utilitarian objective.").

■ Fair use developed in English courts during the eighteenth century as an equitable exception to copyright protection. *See Monge*, 688 F.3d at 1170–71; *see generally* Matthew Sag, *The Prehistory of Fair Use*, 76 Brook. L.Rev. 1371, 1372–73 (2011). An early commentator explained its basic rationale:

> Every single book, ... sold by the proprietor, becomes the property of the buyer who purchases, with the book, the right of making such use of it as he shall think most convenient, either for his own improvement or amusement, or the benefit or entertainment of mankind.

> \* \* \*

> By these liberties it is obvious, that authors and proprietors may often suffer, and sometimes unjustly: but as these liberties are encouraged and allowed for the same reason with writing itself, for the discovery and propagation of truth, though, like other human goods, they have their alloys and ill consequences; yet, as their advantages abundantly preponderate, they have never yet been abolished or restrained.

> Thus every book, when it falls into the hands of the reader, is liable to be examined, confuted, censured, translated, and abridged; any of which may destroy the credit of the author, or hinder the sale of the book.

Samuel Johnson, *Considerations on the Case of Dr. T[rapp]'s Sermons* (Edward Cave ed., 1739), *reprinted in* 2 Arthur Murphy, *The Works of Samuel Johnson* 547 (1st Am. ed., New York, George Dearborn 1832).

Over the past two centuries, American courts have applied similar reasoning in adopting fair use principles into copyright analysis. *See, e.g., Folsom v. Marsh,* 9 F.Cas. 342, 347 (C.C.Mass.1841) (No. 4901) (acknowledging that "[i]t is the supposed exclusive copyright in ... writings, which now encourages their publication," but recognizing that a copyright does not protect against "an original and new work" that is "derived ... from common sources of information, open to all authors" or "a justifiable use of the original materials"); *Sampson & Murdock Co. v. Seaver–Radford Co.,* 140 F. 539, 541 (1st Cir.1905) ("[U]nder some circumstances and for certain purposes, a subsequent publisher may draw from the earlier publication its identical words, and make use of them. This is peculiarly so with reference to works in regard to the arts and sciences, using those words in the broadest sense, because, with reference to them, any publication is given out as a development in the way of progress, and, to a certain extent, by common consent, including the implied consent of the first publisher, others interested in advancing the same art or science may commence where the prior author stopped.").

The current Copyright Act merely codified the existing doctrine as it had developed over time. *See* H.R.Rep. No. 94–1476, at 66, *reprinted in* 1976 U.S.C.C.A.N. 5659, 5680 (1976) ("Section 107 is intended to restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way."). The statute does not directly define "fair use," which is at heart an "equitable rule of reason." *Dr. Seuss Enters.,* 109 F.3d at 1399 (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 448, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984)). Instead, the Act guides courts determining whether a particular use is fair in two ways. First, it lists several nonexclusive examples of fair use: "reproduction ... for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research." 17 U.S.C. § 107. The Act also provides a structure for the analysis by setting forth four factors that courts should consider:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

*Id.*

 The fair use analysis is flexible, and a court may consider additional factors on a case-by-case basis. *Leadsinger, Inc. v. BMG Music Publ'g,* 512 F.3d 522, 529 (9th Cir.2008) (citing *Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 577, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994)). These factors are not considered in isolation but instead are weighed together "in light of the copyright law's purpose 'to promote the progress of science and art by protecting artistic and scientific works while encouraging the development and evolution of new works.'" *Id.* (quoting *Mattel,* 353 F.3d at 799). Because fair use is an affirmative defense, the defendant bears the burden of proof. *Monge,* 688 F.3d at 1170.

## A. *Purpose and Character of the Use*

 The first fair use factor requires consideration of the purpose and

character of the allegedly infringing use. This inquiry's "central purpose" is to determine whether and to what extent the challenged work is "transformative." *Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701, 720 (9th Cir.2007) (quoting *Campbell*, 510 U.S. at 579, 114 S.Ct. 1164). A work is "transformative" when it "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell*, 510 U.S. at 579, 114 S.Ct. 1164. If, on the other hand, the work merely "supersede[s] the use of the original," then "the use is likely not a fair use." *Perfect 10*, 487 F.3d at 720 (*quoting Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 550–51, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985)) (quotation marks omitted). Because transformative works "lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright, ... the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Campbell*, 510 U.S. at 579, 114 S.Ct. 1164 (internal citation omitted).

## 1. Transformative Use

■ Defendants' use of Plaintiff's song is highly transformative. It both adds new expressive content and uses Amy Kuney's original expression for an entirely different purpose.

### a. New Expressive Content

When "All Downhill from Here" is played in *Catfish*, it comprises only part of the scene. In addition, the scene includes video footage of Yaniv, Ariel, and Henry, their room, and Ariel's laptop screen and keyboard. It also includes original dialogue and other sounds. As Yaniv plays the track of the Acoustic Recording from Angela's Facebook page, Ariel indicates his critical approval of the song by commenting "[t]his one's sick." [5] (DVD at 20:29–20:31.) When Ariel plays the Studio Recording after finding it on the Internet, Yaniv and Ariel comment on its similarity to the Studio Recording, but Ariel opines that the Acoustic Recording—which he believes was made by Angela and Megan— "is better." (DVD at 21:32–21:37.) When Ariel finds and plays a copy of the Acoustic Recording attributed to Amy Kuney, he and Yaniv listen critically and discuss whether it is the same recording that Angela posted on her Facebook page. Most of their dialogue occurs while the music is playing.

■ This critical commentary and analysis falls squarely within the category of new expressive content that transforms the copyrighted expression into something different. When a defendant uses the plaintiff's copyrighted material for the purpose of "criticism and review," the defendant may copy "substantial passages ... because the review supplements, but does not replace, the function of the work being reviewed." 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.05[B][6] (rev. ed.2010). "Criticism and review" are construed broadly and include comment on the copyrighted work to correct "unfair, inaccurate, or derogatory information." [6] H.R.Rep. No. 94–1476,

---

**5.** It is clear from context that he uses "sick" in the sense of "crazy, cool, insane," or "awesome." Urban Dictionary, http://www.urbandictionary.com/define.php?term=sick (last visited Jan. 19, 2013).

**6.** Most often, comment for the purpose of correcting inaccuracies involves "an individu-

al ... rebutting a copyrighted work containing derogatory information about himself." *Hustler Magazine Inc. v. Moral Majority Inc.*, 796 F.2d 1148, 1153 (9th Cir.1986). The comment in this case serves the same general goal of informing the public about a factual mistake in connection with a copyrighted

at 73, *reprinted in* 1976 U.S.C.C.A.N. 5659, 5687 (1976).

That Yaniv's and Ariel's opinions were expressed using words such as "sick," "better," and "worse" rather than more erudite language does not diminish their value or entitlement to protection. *Cf. Campbell,* 510 U.S. at 582, 114 S.Ct. 1164 ("The threshold question when fair use is raised in defense of parody is whether a parodic character may reasonably be perceived. Whether, going beyond that, parody is in good taste or bad does not and should not matter to fair use." (footnote omitted)). Nor is it relevant that their commentary was presented as part of a work of entertainment. *See* William F. Patry, *Patry on Fair Use* § 3:8 (2012) ("[M]uch comment and criticism are made in an entertainment context." (citing *Wade Williams Distribution, Inc. v. ABC,* No. 00 Civ. 5002(LMM), 2005 WL 774275, at \*9, 2005 U.S. Dist. LEXIS 5730 (S.D.N.Y. Apr. 5, 2005); *Hofheinz v. Discovery Commc'ns, Inc.,* No. 00 CIV. 3802(HB), 2001 WL 1111970, at \*4, 2001 U.S. Dist. LEXIS 14752 (S.D.N.Y. Sept. 20, 2001))).

### b. Different Purpose

Defendants' use of Plaintiff's work in *Catfish* also serves a completely different purpose than the original. This consideration is important and on more than one occasion has led the Ninth Circuit to sanction as fair the wholesale copying of an entire work. *See, e.g., Perfect 10,* 487 F.3d at 721–22 ("[E]ven making an exact copy of a work may be transformative so long as the copy serves a different function than the original work." (citing *Kelly v. Arriba Soft Corp.,* 336 F.3d 811, 818–19 (9th Cir.2003))).

The purpose of "All Downhill from Here" is to entertain the listener (Opp'n at 17) through Amy Kuney's music and lyrics, which describe a person who has with-

drawn from the world after a failed relationship. The purpose of including Kuney's song in *Catfish* was not to entertain using Kuney's music and lyrics or even to evoke a similar story line. Rather, the purpose was to show that Angela was lying to Yaniv—to show that Angela and, by extension, "Megan" were not the people who Angela presented them to be. Defendants used "All Downhill from Here" to document this pivotal moment. The song was heard on the audio file that Megan sent Yaniv and claimed to have made with Angela. A slightly different version was found on the Internet, sung by someone with a similar voice named Amy Kuney. Then another version by Kuney was found on the Internet that sounded *exactly* like the one Megan had sent. It was only by critically comparing the song that Megan and Angela claimed to have made with the known Kuney recordings that Yaniv determined that Megan had falsely represented the song as her own. At the same time, the filmmakers were inviting the audience to make the same comparison to reach its own conclusion. This critical analysis is entirely different than the song's original entertainment purpose. *Cf. A.V. ex rel. Vanderhye v. iParadigms, LLC,* 562 F.3d 630, 638–40 (4th Cir.2009) (finding transformative the defendant's copying and storing of student papers for the purpose of comparing them against future papers to uncover plagiarism).

Recently, the Ninth Circuit held that a seven-second clip of *The Ed Sullivan Show* in a musical theater production was fair use because the defendant "put the clip to its own transformative ends" by using it as a historical reference point. *SOFA Entm't v. Dodger Prods.,* 709 F.3d 1273, 1278 (9th Cir.2013). The clip showing Ed Sullivan's introduction of the rock & roll band, the Four Seasons, was played in the defen-

work—here, Angela and Megan's false claim of authorship in Kuney's song.

dant's musical about the band because its appearance on *The Ed Sullivan Show* marked an important turning point in its career. As here, it was clear from the record in *SOFA Entertainment* that the plaintiff's copyrighted material was not used in the defendant's work "for its own entertainment value." *Id.* at 1278.

Similarly, in *Lennon v. Premise Media Corp.*, 556 F.Supp.2d 310 (S.D.N.Y.2008), the district court found that the defendants' use of a 15–second clip of John Lennon's song "Imagine" in the nationally released feature film *Expelled* was both "highly transformative" and fair. The film, "a debate between proponents of intelligent design and the scientific theory of evolution," featured actor Ben Stein interviewing various proponents of each theory interspersed with segments of historical stock footage. *Id.* at 316–17. Its purpose was to earn a financial return for its investors. *Id.* at 317.

Approximately 65 minutes into the 99–minute film, Stein interviews a speaker with a negative view of religion. *Id.* at 317–18. When questioned about his ideal world, the speaker expresses his hope that greater scientific literacy will eventually diminish religion's role in society. Stein then intones that the speaker "would like you to think he's being original but he's merely lifting a page out of John Lennon's songbook." *Id.* at 318 (internal quotation mark omitted). At that point, "Imagine" begins to play—specifically, the lyrics "Nothing to kill or die for / And no religion too"—while sequences of black-and-white archival footage are displayed along with

the lyrics to "Imagine" in subtitles. *Id.* at 317–18. The district court found that the film incorporated the excerpt of "Imagine" for the purposes of criticism and commentary because, by pairing Lennon's "secular utopian vision" with "Cold War-era images," the filmmakers "criticize[d] what [they saw] as the naïveté of John Lennon's views." *Id.* at 323–24.

■ *Catfish* is even more transformative than *Expelled*, which used the copyrighted song and its lyrics to convey the song's original message—albeit in a critical manner. In contrast, Catfish uses Kuney's song as a plot device—in an entirely different story—to identify (or, more accurately, misidentify and then clarify) the song's author.[7] The fact that Kuney is specifically identified in the film as the real author of the copyrighted material also weighs in favor of fair use. *See Marcus v. Rowley*, 695 F.2d 1171, 1176 & n.8 (9th Cir.1983).

Another district court found fair use when several network television stations broadcast clips of the movie *G.I. Joe* as part of their obituary segments on one of the actors, Robert Mitchum. *Video–Cinema Films, Inc. v. CNN, Inc.*, No. 98 CIV. 7128(BSJ), 2001 WL 1518264, 2001 U.S. Dist. LEXIS 25687 (S.D.N.Y. Nov. 28, 2001). The clips lasted 9–20 seconds and the obituaries ran for approximately one to three minutes. After first noting that the clips' use fell squarely into the "news reporting" category, the court then found that the obituaries were transformative new works because they did not merely

---

**7.** This difference is somewhat analogous to the difference in trademark law between classic and nominative fair use. *See Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1031 (9th Cir. 2010) ("Nominative fair use applies 'where a defendant has used the plaintiff's mark to describe the *plaintiff's product*," whereas classic fair use … involves a defendant's use of a descriptive term 'in its primary, descriptive sense.'" (emphasis in *Fortune Dynamic* ) (citations omitted)). The idea behind nominative fair use is that a defendant has a First Amendment right to identify the plaintiff's product as such—even if in conjunction with an advertisement for the defendant's product. *See Toyota Motor Sales, USA, Inc. v. Tabari*, 610 F.3d 1171, 1175–76 & n.1 (9th Cir.2010).

supersede the film. While the film "intended to entertain its audience, as well as to inform them of the reality that American infantrymen faced in World War II, [the] obituaries aimed to inform the viewing public of Mitchum's death and educate them regarding his impact on the arts." *Id.* at *6. Moreover, the defendants used the *G.I. Joe* clips "because of their relevance to Mitchum and not to convey a synopsis of the original film." *Id.*

Here too, Defendants recorded and published clips of Kuney's song not to retransmit its message in a different medium, but because the song played an integral role in the plot of an unfolding story about the reality and unreality of online relationships. Both the obituaries in *Video–Cinema Films* and the scene at issue in *Catfish* are, in a superficial sense, designed to "entertain." Crucially, however, they do not entertain in the same way as *G.I. Joe* or "All Downhill from Here," respectively. For that reason, they are transformative.

Plaintiff argues that "Defendants could have used an alternative story-telling device to reveal that Angela was lying without gratuitously playing the Song over and over again." (Opp'n at 17.) This statement is wrong on two points. First, "All Downhill from Here" was not repeated "gratuitously," as discussed in Part C, below. As for the use of Kuney's rather than some other song, it is undisputed that the filmmakers had no choice in the matter. The uncontroverted evidence shows that the filmmakers were documenting the real-life relationship between Yaniv and Angela. Although Plaintiff disputes that the filmmakers were chronicling real-life events in certain respects (*see* Opp'n at 3 ("Whether the story in the film is real or fake remains disputed.")), Plaintiff ultimately fails to present evidence showing that Yaniv, Ariel, and Henry had any control over which songs Angela chose to send to Yaniv.

For example, Plaintiff points out that *Catfish* was marketed as a "reality thriller" rather than a "documentary" and that "[p]ublic controversy about the authenticity of the film has been widespread." (*Id.*) Setting aside the fact that the label "reality thriller" plainly suggests that the film is a thrilling depiction of reality, how Defendants chose to label their film is not dispositive as to how it should be characterized. *See Campbell*, 510 U.S. at 583 n.17, 114 S.Ct. 1164 ("2 Live Crew need not label their whole album, or even this song, a parody in order to claim fair use protection."). Whether certain members of the general public doubt that the events depicted in the film are real is irrelevant. To create a genuine issue of material fact, Plaintiff must point to evidence that controverts Defendant's sworn statements that the scene in question depicts real-life events. (*See* Joost Decl. ¶¶ 8–15; Schulman Decl. ¶¶ 2, 4; Wesselman Depo. at 37:11–38:3; 84:19–87:9; 111:23–112:3.) Plaintiff does not do so.

Plaintiff's contention that Yaniv was engaged in an off-camera relationship with another woman while pretending to flirt with Megan on camera is similarly irrelevant. Even if true, the fact that Yaniv may have been faking his attraction to Megan so that the filmmakers could take advantage of the "undeniably exploitive implications of their stumbled-upon story" shows only that the film was "slipshod in its adherence to basic ethical norms." A.O. Scott, *The World Where You Aren't What You Post*, N.Y. Times, Sept. 17, 2010, at C1. In fact, the evidence Plaintiff submits in support of its contention about Yaniv's off-camera relationship confirms Defendants' version of events in the only critical respect: that Yaniv did *not* realize before the scene at issue that Angela had copied the songs from somewhere else and was genuinely surprised to find out the truth. In other words, Defendants' only

choices were whether to publish the story at all and, if so, how much of "All Downhill from Here" to include.

### 2. Commercial Use

Another consideration in evaluating the purpose and character of the use is that *Catfish* was a commercial rather than non-profit endeavor. *See* 17 U.S.C. § 107(1); *Campbell,* 510 U.S. at 584, 114 S.Ct. 1164. While this fact in isolation tends to weigh against a finding of fair use, Defendants' highly transformative use of Kuney's song minimizes its significance. *See Campbell,* 510 U.S. at 579, 584–85, 114 S.Ct. 1164; *see also SOFA Entm't,* 709 F.3d at 1279 (finding the fact that the defendant's work was a commercial production to be "of little significance" in the first fair use factor because the defendant's use of the plaintiff's copyrighted work was transformative). On balance, the Court finds that the first fair use factor strongly favors Defendants.

### B. *Nature of the Copyrighted Work*

The second statutory factor, the nature of the copyrighted work, "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Id.* at 586, 114 S.Ct. 1164. Kuney's "original's creative expression for public dissemination" easily fits "within the core of the copyright's protective purposes." *Id.* Nonetheless, *Catfish* also lies within this protected core for reasons that have nothing to do with Defendants' use of Kuney's song. Moreover, filmmakers recording real-life events "almost invariably copy publicly known, expressive works." *Id.*; *cf., e.g., Italian Book Corp. v. Am. Broad. Cos., Inc.,* 458 F.Supp. 65 (S.D.N.Y.1978) (finding fair use where news footage of parade incidentally recorded performance of the plaintiff's song). Therefore, this factor does not

greatly assist the Court "in separating the fair use sheep from the infringing goats." *Campbell,* 510 U.S. at 586, 114 S.Ct. 1164.

### C. *Amount and Substantiality of the Portion Used Relative to the Copyrighted Work as a Whole*

▮ The third statutory factor "asks whether 'the amount and substantiality of the portion used in relation to the copyrighted work as a whole' ... are reasonable in relation to the purpose of the copying." *Id.* at 586, 114 S.Ct. 1164. It requires an examination of both quantitative and qualitative factors. *Monge,* 688 F.3d at 1178.

▮ Plaintiff first argues that "the sheer amount of the song used in the three-minute scene is substantial" because Defendants use clips of approximately 22% of the Acoustic Recording and 12% of the Studio Recording. (Opp'n at 20–21.) The third statutory factor does not lend itself to such a mechanical analysis. "The inquiry under this factor is a flexible one, rather than a simple determination of the percentage of the copyrighted work used." *Monge,* 688 F.3d at 1179.

The filmmakers used no more of Kuney's song than necessary to document the critical moment when Yaniv discovered that Angela was lying to him. The first use of the song, when Yaniv plays a clip of the recording that was supposedly made by Angela and Megan but later revealed to be the Acoustic Recording, lasts for only 19 out of 189 seconds—from the beginning through a portion of the first verse. It is enough to give the audience a sense of the song but no more. The second use of the song, when Ariel sings along for approximately 16 seconds to recall the lyrics while typing them into a search engine, is similarly no longer than necessary to give the audience a sense of what he is doing.

The third and fourth uses, lasting respectively 28 out of 209 seconds (the Studio Recording) and 41 out of 189 seconds (the Acoustic Recording), are also no longer than necessary to serve the purpose of revealing Angela's lie. The third use merely repeats a similar portion of the Studio Recording as was heard in the Acoustic Recording but attributed to Angela and Megan. It is long enough for Yaniv and the filmmakers to comment on and for the audience to grasp the two versions' similarity. The fourth use, when it becomes clear that the Acoustic Recording attributed to Kuney is in fact identical to the Acoustic Recording attributed to Angela and Megan, is somewhat longer because Yaniv, Ariel, and Henry are commenting on the track more actively as it continues to play in the background.

Plaintiff maintains that "Defendants reproduced the heart of the Song (i.e., the chorus) and played it repeatedly." (Opp'n at 21.) Only the fourth and possibly the second use (Ariel's singing is largely unintelligible) contain the chorus, and by the time in the fourth use when the chorus is heard, the scene's focus is on the realization that Angela has lied rather than on presenting the music for its own inherent entertainment value.

Plaintiff also asserts that Defendants could have used some alternative plot device to reveal Angela's deception instead of playing Kuney's song repeatedly (Opp'n at 17)—though it does not explain how. It is true that the filmmakers could have, for example, reenacted the scene later using different music or replaced the scene with an interview of Yaniv narrating the key events. But such alternatives artificially impinge upon the creative process. They would force the filmmakers to sacrifice the film's verisimilitude, its drama, or both. The descriptive term "reality thriller" would no longer apply.

Although one might quibble whether the filmmakers could have cut a second or two from their uses of Kuney's song in order to further reduce its overall exposure, the overall amount used was reasonable in light of their purpose. As such, the third statutory factor favors Defendants.

## D. *Effect on the Potential Market for the Copyrighted Work*

The fourth fair use factor "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in a substantially adverse impact on the potential market' for the original." *Campbell*, 510 U.S. at 590, 114 S.Ct. 1164 (quoting 3 Nimmer § 13.05[A][4] (1993)). Plaintiff does not argue that *Catfish* affected the market for recordings of Kuney's song.[8] (*See* Barker Depo. at 145:22–146:5 (conceding that it did not).) No one would purchase the right to view *Catfish* as a substitute for purchasing Amy Kuney's song. To begin with, the longest single clip of the song lasts only 41 seconds, amounting to approximately 38% of the song. Websites that sell digital copies of music online routinely allow potential buyers to play a sam-

---

**8.** For this reason, Plaintiff's contention that market harm can be presumed from *Catfish*'s commercial nature (Opp'n at 23) is flawed because *Catfish* does not commercially compete with "All Downhill from Here." To the extent the language in *Elvis Presley Enterprises, Inc. v. Passport Video* suggests otherwise, 349 F.3d 622, 631 (9th Cir.2003) (citing *A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1016 (9th Cir.2001)), *Campbell* flatly overruled it. *See* 510 U.S. at 591, 114 S.Ct. 1164 ("No 'presumption' or inference of market harm that might find support in *Sony* is applicable to a case involving something beyond mere duplication for commercial purposes."); *see also Monge*, 688 F.3d at 1181 (observing "the Supreme Court's admonition eschewing presumptions under this factor").

ple—typically lasting 30 seconds or more—before deciding whether to purchase the song.[9] It is inconceivable that hearing a similarly timed clip of Kuney's song in *Catfish* would dissuade a listener from purchasing it if the listener were otherwise predisposed to do so. Furthermore, the audio quality of the song in the film is low because it is played through speakers on Ariel's laptop and captured on film as ambient sound rather than recorded directly into the film's audio track—or at least the film is engineered to sound that way.

 Instead, Plaintiff maintains that *Catfish* impaired the market for synchronization licenses to "All Downhill from Here."[10] (Opp'n at 22–24.) Yet, there is no obvious reason why that would be the case. Plaintiff begins with the assumption that the onetime use of her song for synchronization in a single television show—*One Tree Hill*—shows a market demand for its future synchronization in television and other media. This is doubtful, but even if, *arguendo*, it were true, Plaintiff's conclusion—that *Catfish*'s theatrical release caused a subsequent falloff in synchronization demand—does not follow.

When a new song is released, the demand to synchronize it to television shows and movies inevitably tapers off over time

as the song falls out of people's favor or memories. Of course, the rate at which any given song is forgotten will vary— some songs, such as *Imagine*, endure longer than others.[11] Written in 2007 and first published on May 18, 2008, the Studio Recording was licensed the next day for use in a *One Tree Hill* episode. (Opp'n, Exs. 24, 25; *see also* Barker Depo. at 160:23–25.) More than two years passed before Defendants released *Catfish*, in which time there were no further licenses for the synchronization of the Studio Recording in any medium. (*See* Barker Depo. at 155:18–159:7.) The Acoustic Recording, also published in 2008 (Opp'n, Ex. 24), has never been licensed. (*See* Barker Depo. at 158:23–159:7.) These facts are inconsistent with Plaintiff's assertion that a synchronization market exists.

To the extent some exogenous factor suppressed the demand to synchronize Kuney's song, it is far more likely that the song's synchronization use in *One Tree Hill* rather than its non-synchronization use in *Catfish* is to blame. The creators of other television shows and movies, wanting their works to appear fresh, may not want to synchronize a song that has already been heard on television. Although Plaintiff points out that four of Kuney's other songs have been licensed for synchronization (*see* Opp'n at 24, Ex. 26), there is no

---

9. For example, iTunes currently allows users—whether potential customers or not— to stream 90 seconds of the Studio Recording (containing the end of the introductory verse, the entire chorus, and most of the second verse) for free on demand. *See* https://itunes.apple.com/us/album/all-downhill-from-here-feat./id280354066 (last visited Jan. 18, 2013).

10. In general, it is necessary to obtain a "synchronization license" to include a musical composition that is not in the public domain in an audiovisual work. *See Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 527 (9th Cir.2008). "The synchronization license allows one to reproduce the musical composition and synchronize the music with the visu-

al images." Alexander Lindey & Michael Landau, 3 *Lindey on Entertainment, Publishing and the Arts* § 7:62 (3d ed.2012); *see also* 6 Nimmer, *supra*, at § 30.02[F][3] ("A license is necessary if an existing musical composition is to be used in synchronization or 'timed-relation' with an audiovisual work, such as a theatrical or television motion picture or commercial. These licenses are commonly referred to as 'synch licenses.'")

11. There are likely factors other than memory that influence synchronization demand over time. For example, the creators of audiovisual works may have a preference for songs that have been recently released.

evidence that any of Kuney's songs has been licensed more than once. Plaintiff simply fails to articulate how the over-whelmingly positive reception that greeted "All Downhill from Here" in *Catfish* harmed its synchronization market in a way that its use in *One Tree Hill* did not.[12] The fourth fair use factor thus favors Defendants.

### E. *Balancing the Factors*

Drawing all reasonable inferences in favor of Plaintiff, a reasonable factfinder could conclude that parts of the film were dishonest or deceptive. Most notably, there is evidence that Yaniv had a serious romantic relationship with a woman in New York while he was cultivating his online relationship with "Megan" and did not disclose this fact to Megan. There is evidence that the filmmakers deliberately omitted this fact from the film to make the story seem less staged. But this evidence does not undermine the uncontroverted evidence that *Angela*'s actions (including those of her alter egos) were her own—they were not scripted, prompted, or directed by anyone else.

Angela decided to post the Studio Recording on Facebook, and it was upon hearing the Studio Recording that Yaniv first realized that Megan and Angela were lying to him. The filmmakers did not have a choice which song they could use in their story to document that critical moment—for better or for worse, they were stuck with "All Downhill from Here" if they wanted to remain faithful to the documentary style of their film.

The facts here thus differ from the synchronization context, where the filmmakers or studio can bargain with various artists for the use of their songs in a film, television show, or commercial. If one artist presents a holdout problem, demanding unreasonably high licensing fees, there are alternatives. Although the alternative songs may be less aesthetically pleasing, there is a sufficiently large market that the filmmaker or studio can decide how to balance the economic and artistic tradeoffs.

■■■ "The fair use doctrine must strike a balance between the dual risks created by the copyright system: on the one hand, that depriving authors of their monopoly will reduce their incentive to create, and, on the other, that granting authors a complete monopoly will reduce the creative ability of others." *Sony,* 464 U.S. at 479, 104 S.Ct. 774 (Blackmun, J., dissenting); *see also SOFA Entm't,* 709 F.3d at 1277–78 (explaining that the Copyright Act "grant[s] authors a 'special reward' in the form of a limited monopoly over their works" in order "to stimulate artistic creativity for the general public good" but that the doctrine of fair use prevents "an overzealous monopolist [from] us[ing] his copyright to stamp out the very creativity that the Act seeks to ignite" (citations and internal quotation marks omitted)). Here, there was not a large market to which Defendants could turn. Their only choice was to release the film or not. To hold that their use of Amy Kuney's music was not fair would be to grant Plaintiff not just a copyright but—in effect—a veto over a new, transformative work.[13] That would not serve the purposes of the Copyright Clause.

---

12. The conclusory statements to the contrary by Plaintiff's expert (*see* Barker Depo. at 155:7–14) fail to explain how the song's exposure in *Catfish* causally impacted its synchronization market adversely.

13. Whether or not Defendants first attempted to gain Plaintiff's permission to use "All Downhill from Here" is irrelevant. "If the use is otherwise fair, then no permission need be sought or granted." *Campbell,* 510 U.S. at 585 n.18, 114 S.Ct. 1164.

## VI.

## CONCLUSION

In light of the foregoing, Defendants' motion for summary judgment and/or partial summary judgment is **GRANTED**. Judgment shall be entered in favor of Defendants on Plaintiff's copyright infringement claims arising from the commercial version of *Catfish*.

**IT IS SO ORDERED.**